# State of Connecticut *v.* Arthur Harris

Cotter, C. J., Bogdanski, Healey, Parskey and A. Armentano, Js.

Argued June 3—decision released August 19, 1980

*Alphonse DiBenedetto,* public defender, for the appellant (defendant).

*Linda K. Lager,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Richard P. Sperandeo,* chief assistant state's attorney, for the appellee (state).

PARSKEY, J. After a jury trial the defendant was convicted of murdering William Earl Gilbert. On appeal the defendant seeks a reversal based on (1) the insufficiency of the evidence, (2) two rulings by the court declaring two state's witnesses to be hostile witnesses, (3) a ruling on evidence, (4) the defendant's failure to receive a fair trial because of the cumulative effect of ineffective assistance of counsel and prejudicial comments by the prosecutor, (5) improper comments on the evidence by the court, and (6) an error in the court's charge to the jury.

To determine whether the evidence is sufficient to support a jury verdict of guilty, we review the evidence presented at trial and construe it in the manner most favorable to sustaining the verdict. *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). The issue before us is whether the jury could have reasonably concluded, from the facts established and the reasonable inferences drawn therefrom, that the evidence was sufficient to justify a verdict of guilty beyond a reasonable doubt. *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978).

From the evidence presented at trial the jury could reasonably have found the following: The

victim's body had been found in the West Rock Park area of Hamden at approximately 10:30–11:00 p.m. on November 4, 1973. The time of death was between 9 and 10 p.m.; the cause, destruction of the spinal cord caused by a bullet entering the victim's back. A witness who lived in the vicinity heard six shots between 9:05 and 9:10 p.m. Three spent .44 magnum shells and a spent .44 magnum copper jacket hollow point bullet were found at the scene; another bullet was found lodged in a nearby tree. Both bullets were fired from the same gun, a .44 magnum Ruger rifle.

For a number of years prior to the shooting, the defendant was aware that his wife, Louise Harris, and William Gilbert were having an affair. This engendered hostility between the defendant and Gilbert which was manifested in 1971 when Gilbert shot and wounded the defendant after the defendant entered Gilbert's apartment with a starter's pistol while Gilbert and the defendant's wife were in the bedroom. After this incident the defendant and his wife separated for about a year.

In February or March of 1973, the defendant told Ernest Tarducci, the son of the defendant's deceased employer, that he had a .44 magnum rifle. The next day the defendant brought some .44 magnum ammunition in to work to show Tarducci, who owned a .44 magnum pistol. These bullets fit both a .44 rifle and a .44 magnum pistol. A month later Tarducci saw the defendant remove a small rifle, possibly a Ruger semiautomatic .44 magnum, from a truck. At another time the defendant showed his stepson a rifle which looked like a .44 magnum and which the stepson assumed was a .44 magnum. The defendant also had about a half case of .44 magnum bullets.

On the morning of November 4, 1973, Louise Harris returned home with scratches on her hand that she received while fighting with Gilbert. She and the defendant argued about her continuing to see Gilbert. Gilbert had an 8 p.m. appointment to meet "Louise" on November 4, 1973. The spot in West Rock Park where Gilbert's body was found was his favorite place to take Louise Harris.

The defendant went to a poolroom sometime between 8:30 and 9 p.m. to attempt to buy liquor. The 8.8 mile trip from that poolroom to the place where Gilbert was found would take about nineteen minutes by car.

Approximately six hours after Gilbert was shot two members of the Hamden police department and one member of the New Haven police department went to Arthur Harris' residence at 29 Level Street in New Haven because a telephone bill made out to Louise Rodgers, also known as Louise Harris, at 29 Level Street was found in Gilbert's wallet. At that time they questioned the defendant, but conducted no search of the premises. A search of the Harris apartment was conducted with the defendant's consent on November 7, 1973. That search yielded a .44 magnum bullet with a lead hollow head that had been chambered in the same gun that had fired the three shells found near Gilbert's body. This bullet resembled the other .44 magnum bullets which the defendant had and was also, as far as could be determined, the same as the bullets found at the scene of the crime.

There was abundant evidence presented in this case regarding the defendant's motive for killing Gilbert. While evidence of motive does not establish

an element of the crime charged; see *State* v. *Annunziato,* 169 Conn. 517, 530, 363 A.2d 1011 (1975); such evidence is both desirable and important. See *State* v. *Doucette,* 147 Conn. 95, 103, 157 A.2d 487 (1959) (overruled on other grounds in *State* v. *Tillman,* 152 Conn. 15, 20, 202 A.2d 494 [1964]). It strengthens the state's case when an adequate motive can be shown. *State* v. *Hoyeson,* 154 Conn. 302, 307, 224 A.2d 735 (1966). Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant. *State* v. *Rathbun,* 74 Conn. 524, 529, 51 A. 540 (1902). This factor is to be weighed by the jury along with the other evidence in the case. *State* v. *Annunziato,* supra. The role motive plays in any particular case necessarily varies with the strength of the other evidence in the case. "The other evidence may be such as to justify a conviction without any motive being shown. It may be so weak that without a disclosed motive the guilt of the accused would be clouded by a reasonable doubt." *State* v. *Rathbun,* supra, 529–30.

Aside from evidence of motive, there was evidence that the defendant had access to a .44 magnum rifle. See *State* v. *Villafane,* 171 Conn. 644, 675, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977). A live round of ammunition which was found in the defendant's possession had been chambered in the weapon most likely used to kill Gilbert. That Gilbert was shot in the back lends support to the conclusion that the shooting was intentional. See *State* v. *Bzdyra,* 165 Conn. 400, 405, 334 A.2d 917 (1973). Together with the extensive evidence regarding

motive, this evidence was sufficient to allow the jury reasonably to conclude that the defendant was guilty beyond a reasonable doubt.

The defendant next claims that the trial court erred in declaring two state's witnesses to be hostile and in allowing the state to impeach their testimony by introducing prior inconsistent statements into evidence. The first such ruling occurred when the defendant's stepson, Jessie Rodgers, was on the stand. He had given three statements to the police shortly after the homicide. When confronted with these statements during his testimony, he claimed that he was misled into making the statements and that he could not remember saying what was in the statements. Further, the state's attorney represented that, on the basis of a prior conference with the witness, he expected the witness' testimony to square with the earlier statements. Relying on both hostility and surprise, he then sought and obtained a ruling declaring the witness hostile. The determination of hostility rests in the sound discretion of the court. *State* v. *Roberson,* 173 Conn. 97, 99–100, 376 A.2d 1089 (1977). The court below was acting well within its discretion in making the ruling complained of. See *Liebman* v. *Society of Our Lady of Mount St. Carmel, Inc.,* 151 Conn. 582, 587–89, 200 A.2d 721 (1964). See 2 Wharton, Criminal Evidence (13th Ed.) § 484.

The defendant also contends that the court erred in admitting into evidence one of the three statements given by Jessie Rodgers, which had been tape recorded. At trial the defendant raised the objection that the statement could not properly be used to impeach because the witness was not sufficiently hostile in the legal sense. In light of our

resolution of the hostility issue, the defendant's argument fails. The other grounds argued on appeal for excluding the evidence were not raised before the trial court. As to these grounds, we cannot conclude that the record supports a claim that the defendant has been denied a fundamental constitutional right and a fair trial. Accordingly, we do not discuss these grounds. *State* v. *Adams,* 176 Conn. 138, 144–45, 406 A.2d 1 (1978); Practice Book, 1978, § 3063. See *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

The defendant also challenges the court's ruling declaring Charles Rodgers, another witness called by the state, to be a hostile witness. The witness testified that he was the defendant's brother-in-law and that they grew up together. After reading his prior statement given to the police, the witness denied ever having said part of what was in the statement. At this point the witness was declared to be hostile. This ruling did not rest on any claim of surprise. Rather, it is supported on the dual basis of the close relationship between the witness and the accused and the inconsistency between the witness' prior statement and his testimony in court. See *State* v. *Esposito,* 166 Conn. 550, 554, 353 A.2d 746 (1974). Under the circumstances the court properly exercised its discretion when it declared Charles Rodgers to be a hostile witness. See *Liebman* v. *Society of Our Lady of Mount St. Carmel, Inc.,* supra, 589.

The witness' prior inconsistent statement was introduced into evidence for impeachment purposes. The defendant claims that the statement, in which Rodgers indicated that the defendant told Rodgers that he shot Gilbert, should have been excluded

from the case because its prejudicial impact outweighed its probative value. Prior to the statement being admitted into evidence, however, the witness had already testified without objection that he "didn't say my brother-in-law shot him" and "I did not say that he shot William Earl Gilbert." The critical information, therefore, had already been presented to the jury before the prior statement was formally admitted.

In *State* v. *Vennard,* 159 Conn. 385, 392–94, 270 A.2d 837 (1970), cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 (1971), we found error, albeit harmless, when the trial court admitted a highly prejudicial statement for purposes other than proving the truth of the matter asserted in the statement. This conclusion was grounded on the statement's limited probative value combined with the presence of a nonprejudicial alternative method for establishing the point at issue. Id., 392–93. The present case is clearly distinguishable from *Vennard* in that the goal sought, impeaching the witness' credibility, could not be achieved through any other means. The witness had directly contradicted his prior statement. The only way to give the jury the benefit of this contradiction was to admit the prior statement. See *State* v. *Roberson,* 173 Conn. 97, 100, 376 A.2d 1089 (1977); 2 Wharton, Criminal Evidence (13th Ed.) § 484. At the close of the trial, the court clearly instructed the jury that they were to consider the prior statement of Charles Rodgers as bearing only on his credibility. No error resulted from allowing the impeaching statement into evidence.

The defendant next attacks the allowance into evidence of his silence in the face of an accusatory

statement made in his presence as an admission by conduct. The state sought to introduce the contents of a conversation[1] described by Wedal Rodgers, the wife of the defendant's stepson Jessie Rodgers, in which Louise Harris threatened to kill her husband, the defendant, followed by the defendant's silence, under the rule articulated in *State* v. *Ferrone,* 97 Conn. 258, 266, 116 A. 336 (1922). That case holds that statements made within the accused's "hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak

---

[1] The pertinent testimony is as follows:

"Q. What was said in Arthur's presence?

A. The first thing Louise said, 'They took him from me,' and —

Q. Will you keep your voice up now, please.

A. Yes. She said, 'They took him from me,' and then she turned around and said she is waiting for William to call her.

Q. She was what?

A. Waiting on William to call her. And she just that night just couldn't believe that he was dead.

Q. What else was said?

A. Well, there was my aunt and Eloise, they were trying to talk her into going to Long Wharf to get a sedative for her to go to sleep or relax her.

Q. What is at Long Wharf?

A. There is a medical center there. And then she got really hysterical and she got up and I can't remember what was said to her to get her hysterical, but she got up and she started upstairs saying that she was going to go get a gun to kill Arthur.

Q. What did Arthur say when she said she was going to get the gun to kill Arthur?

A. I can't remember him saying anything.

Q. Did he mumble anything?

A. I can't remember.

Q. You can't remember?

A. No."

and the circumstances naturally called for a reply from him." Id., 265–66. See 3 Wharton, Criminal Evidence (13th Ed.) § 700.

Louise Harris' statement is subject to varying interpretations. In one sense it is accusatory. Prior to threatening to kill the defendant, she was bemoaning the death of Gilbert. Juxtaposed, these statements suggest that the threat manifested a desire for revenge against her lover's killer. Such an accusation ordinarily calls for a response; consequently, the ensuing silence, under circumstances where the defendant could have protested his innocence, could be construed as an admission of guilt and was therefore admissible under *Ferrone.*

Although evidence of silence in the face of an accusation may be admissible under the ancient maxim that "silence gives consent" the inference of assent may be made only when no other explanation is equally consistent with silence. *State* v. *Bates,* 140 Conn. 326, 328, 99 A.2d 133 (1953). The presence of physical or emotional factors may be a sufficient impediment in a given case to the invocation of the inference. McCormick, Evidence (2d Ed.) § 270, p. 653. In this case, for example, there was evidence that at the time she made her threat Louise Harris was hysterical. In this circumstance the defendant may well have felt that any response on his part either would have been pointless because his wife's agitated mental condition precluded her from appreciating any reasonable rejoinder or might have exacerbated the existing tension. Because the situation involved the rantings of an hysterical person the conversation and ensuing silence should not have been admitted under *Ferrone.*

Because this error was not of a constitutional dimension the defendant has the burden of demonstrating that the error was harmful. *State* v. *Ruth,* 181 Conn. 187, 197, 435 A.2d 3 (1980). This has not been done. His primary contention is that allowing the conversation into evidence improperly fortified the evidence of the defendant's motive for killing Gilbert. He argues that the conversation served to underscore the existence of an amorous relationship between Gilbert and Louise Harris. The record is replete with evidence of this relationship. To the extent that this conversation further supports the existence of such a relationship, it was merely cumulative, and thus its admission was not reversible error. *State* v. *Barber,* 173 Conn. 153, 160, 376 A.2d 1108 (1977); *State* v. *Jeustiniano,* 172 Conn. 275, 283, 374 A.2d 209 (1977). The existence of an affair between Louise Harris and Gilbert was established by the competent testimony of three witnesses, Wedal Rodgers, the defendant's stepdaughter-in-law; Brenda Myers, Gilbert's first cousin; and Mary Louise Lucky.

The defendant also makes the broad assertion that he did not receive a fair trial. He rests this claim on more than thirty-two separate instances of error, the cumulative effect of which allegedly denied him the fair trial to which he was constitutionally guaranteed. U.S. Const., amend. XIV; Conn. Const., art. 1 § 8. He seeks appellate review in this regard under the doctrine announced in *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). With the exception of the claim of ineffective assistance of counsel, none of these separate instances viewed in isolation rises, nor is claimed to rise, to the level of "exceptional circumstances" required by *Evans* to obtain appellate review of a claimed

error not raised and decided by the trial court. See id., 69–70. Because the defendant's claim rests primarily on the cumulative effect of many alleged miscues that occurred over the course of the trial, we neither review each miscue in isolation nor pass upon the propriety or impropriety of each particular claim raised in the defendant's brief. Rather, we examine the whole record with a view toward determining whether the defendant's trial satisfied the standards set down by the fourteenth amendment to the United States constitution and article first, § 8 of the Connecticut constitution. From the briefs it appears that the individual instances that the defendant maintains deprived him of a fair trial fall into three broad categories. We discuss each one in turn.

With respect to the claim that the prosecutor's prejudicial conduct and comments throughout the trial resulted in an unfair trial, the defendant cites in his brief the prosecutor's action in (1) turning witnesses' statements over to defense counsel in open court, (2) asking leading questions, (3) eliciting testimony of the defendant's prior misconduct, (4) commenting about a prospective witness and (5) making prejudicial comments during final argument. As stated earlier, none of this purported misconduct has been shown to impinge directly on any of the defendant's constitutional rights. Regarding the impact that these actions by the prosecutor had on the overall fairness of the trial, none of the claimed misconduct squarely affected any of the major portions of the state's case. Strong evidence of the defendant's motive along with the ballistics evidence linking the defendant to the gun that fired the .44 magnum shells found near Gilbert's body, which gun the defendant concedes was

used to kill Gilbert, remains for the most part unscathed by the allegations of misconduct. Absent a showing that there is a reasonable possibility that the error complained of might have contributed to the conviction, we cannot hold that any "cumulative error" resulted in the defendant being denied a fair trial. See *Fahy* v. *Connecticut,* 375 U.S. 85, 86–87, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963).

The second broad segment of the cumulative error claim concerns the trial judge's failure to intervene at several points during the trial in order to assure the defendant a fair trial. At the outset we observe that "[t]he action of a judge taking an apparent position of advocacy in a case before him has been continually condemned." *State* v. *Echols,* 170 Conn. 11, 13–14, 364 A.2d 225 (1975). Thus the court did not commit reversible error by failing, suo motu, to prevent the prosecutor from asking certain leading questions and from eliciting hearsay. Moreover, on the basis of the record in this case we cannot conclude that any of the claimed erroneous actions by the court would have been likely to affect the result. *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976).

The final portion of the cumulative error argument concerns the ineffectiveness of the defendant's trial counsel. Because this claim has an independent basis in the sixth amendment to the United States constitution, we review the defendant's contentions in this respect both as combining with the first two categories of cumulative error resulting in the denial of a fair trial and on its own merits with respect to the defendant's independent right to the effective assistance of counsel. See *State* v. *Clark,* 170 Conn. 273, 280, 365 A.2d 1167, cert. denied, 425

U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976). In analyzing this claim, however, we are again constrained to observe that the defendant has not demonstrated that any purported lack of competency contributed to the defendant's conviction. See *State* v. *Barber,* supra; *State* v. *Clark,* supra, 283. None of the claimed instances of incompetence would erase or overcome either the significant evidence of motive or the ballistics evidence. Without a causal link between the alleged mistakes of counsel and the conviction, the claim of ineffective assistance fails. *State* v. *Clark,* supra. Cumulating the effect of all three portions of the defendant's argument, we conclude that he received a fair trial that comported with the standards embodied in the fourteenth amendment to the United States constitution and article first, § 8 of the Connecticut constitution.

The defendant next urges reversal based on a comment on the evidence made by the trial court regarding a missing witness. The remark occurred during a colloquy with counsel in which the propriety of the prosecutor's alluding to a missing witness in his final summation was being discussed.[2]

The defendant did not claim below or before us that such an inference could not properly be drawn by the jury. He only claims that the jury could have believed that the court had itself concluded that there was a missing witness and that an infer-

---

[2] The pertinent remarks are as follows:

"Mr. Eastman: I am going to object to that argument, your Honor. There is no showing that the child knows.

Mr. Sperandeo: I claim it as an inference that can be drawn, your Honor. I think your Honor will bear me out. That is the law.

Mr. Eastman: A seven year old child?

Mr. Sperandeo: That is the law if it please the Court.

The Court: Well, it is a missing witness and unfavorable."

ence unfavorable to the defendant should be drawn therefrom. Contrary to the defendant's assertion on appeal, the judge's statement does not clearly indicate either that the court had drawn an unfavorable inference from the defendant's failure to produce a witness or that the jury were obliged to so conclude. When viewed in context, the judge's comment would fairly be taken by the jury to refer back, in shorthand fashion, to the prosecutor's defense of his summation that an inference *can* be drawn. To the extent that the court's remark is susceptible to a different interpretation, that an unfavorable inference *should* be drawn from the defendant's failure to produce a witness, we conclude that no error resulted therefrom. The remark was fleeting, directed only to counsel, and fairly ambiguous, especially to a lay person unacquainted with the legal principles surrounding the practice of drawing an unfavorable inference from a party's failure to produce a witness under certain circumstances. Moreover, the defendant never requested an instruction to the jury that would have clearly indicated that it was within their province to decide whether an adverse inference should be drawn from the defendant's failure to call the witness. The jury were not misled.

The final two claims of error center on the court's instructions to the jury. The defendant first relies on the portion of the charge instructing the jury that Louise Harris, who the jury had been informed was also arrested and charged with murder and who did not testify, was entitled to a presumption of innocence. In response to an exception taken by the defendant at the conclusion of the instructions, the court explained more fully why she did not testify. At no time did the defendant call to the

court's attention any irregularity concerning the portion of the charge relied upon on appeal. In accord with our practice, this claim may not be raised for the first time on appeal absent a showing of exceptional circumstances. *State* v. *Evans,* supra; Practice Book, 1978, §§ 315, 3063.[3]

Again for the first time on appeal, the defendant assails the jury instructions on intent,[4] relying on *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). Because the error claimed affects a fundamental constitutional right, we review the claim notwithstanding the failure to raise it at trial. *State* v. *Arroyo,* 180 Conn. 171, 429 A.2d 457 (1980). The instructions on intent given in the present case are practically identical to

[3] The defendant attempts to gain appellate review by pointing out that instructing the jury that Louise Harris enjoyed a presumption of innocence precluded him from proving that someone else committed the crime. Because this issue is central to the case, he maintains that it should be cognizable on appeal even though not raised at trial. Even if such a showing constituted "exceptional circumstances" dispensing with the need to raise a point at trial, we do not read the instruction complained of as broadly as does the defendant. Read as a whole; see *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147 (1974); the charge evinces a proper concern by the trial court that the jury would not assume solely on the basis of her being arrested and charged, that Louise Harris murdered Gilbert. Thus viewed, the charge did not curtail the defendant's ability to connect other persons to the crime.

[4] Those jury instructions on intent are as follows:

"Now, intent is a mental process. A person's intentions may be inferred from his conduct. Every person is presumed to intend the natural and necessary consequences of his acts. It is often impossible and never necessary to prove criminal intent by direct evidence.

Ordinarily, intent can be proved only by circumstantial evidence as I have explained that term to you. What a person's purpose or intention has been is necessarily very largely a matter of inference. A person may take the witness stand and testify directly as to what his or her purpose or intention was, and that testimony you can believe or not according to whether or not it warrants belief.

But no witness can be expected to come here and testify that he looked into another person's mind and saw therein a certain purpose

those approved in *State* v. *Arroyo,* supra, 179–81. What was said there need not be repeated here. The charge did not operate to shift the burden of proving the element of intent from the state to the accused.

There is no error.

In this opinion the other judges concurred.

or intention. The only way in which a jury can determine what a person's purpose or intention was at any given time, aside from that person's own testimony, is by determining what the person's conduct was and what the circumstances were surrounding that conduct, and from those infer what the purpose or intention was.

To draw such an inference is not only the privilege but it is also the duty of a jury, provided of course the inference drawn is a reasonable one. In this case, therefore, it will be a part of your duty to draw all reasonable inferences from the conduct of the accused in the light of surrounding circumstances as to what purpose or intention was in his mind at various times."