STATE OF CONNECTICUT v. ROBERT A. GUNNING

BOGDANSKI, PETERS, HEALEY, ARMENTANO and WRIGHT, Js.

300

Argued January 6—decision released March 10, 1981

*Charles D. Gill,* public defender, with whom was *John L. Carbonneau, Jr.,* for the appellant (defendant).

*Richard L. Shiffrin,* assistant state's attorney, with whom, on the brief, was *Dennis A. Santore,* state's attorney, for the appellee (state).

WRIGHT, J. The defendant was charged by indictment with causing the death of another in furtherance of the commission of a robbery on October 11, 1975. After a jury trial, the defendant was convicted of felony murder.[1] On appeal, he claims that

---

[1] The crime was committed on October 11, 1975. At that time General Statutes § 53a-54c provided as follows: "Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, arson, rape in the first degree, deviate sexual intercourse in the first degree, sexual contact in the first degree, escape in the first degree, or escape in the second degree

the trial court erred in admitting evidence of his parolee status and failed to instruct properly both the grand jury and the trial jury. In addition he maintains that he was denied a fair trial because the state did not divulge the identity of one of its witnesses until the eve of trial and that the evidence was insufficient to support the verdict. We discuss each of these five claims in turn.

The defendant's first claim of error relates to the testimony of Detective Sergeant Alfred Columbia, who, during cross-examination by defense counsel, mentioned the fact that the defendant was arrested as a parole violator.[2] The defendant maintains that the court committed error by allowing the reference to the defendant's parolee status because he had neither testified in the case in chief nor put his character or credibility in issue. Although a motion

---

and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] The following exchange occurred while defense counsel sought to elicit whether the defendant was adequately apprised of his constitutional rights before submitting to a skin test which detected metal residue on his hands, indicating recent contact with a firearm.

"[By the defendant's attorney, Henry C. Campbell:] Q. Now you said you advised Mr. Gunning of his Constitutional Rights?

[By Detective Sergeant Alfred Columbia:] A. Yes, I did.

Q. And those rights didn't pertain to the taking of evidence from him, did they?

A. The first time, no, Sir.

Q. By the first time, what are you referring to?

for a mistrial based on Columbia's response was made,[3] the record before us does not indicate that the defendant sought to have the testimony stricken.[4] Consequently this claim must be considered, if at all, under the "exceptional circumstances" doctrine of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). The record does not support the defendant's claim that he was denied a

A. He had been arrested for violation of parole at that time and I advised him of his Constitutional Rights. The second time—that was at 4:27 p.m. on that date, October 12th. And again I advised him at 4:34 p.m., and I performed the test at 4:50.

Q. And at this time he was just a parole violator?

A. Yes, Sir.

\* \* \* \* \*

Q. You indicated, a minute ago, Officer, that the defendant Mr. Gunning had been arrested as a parole violator?

A. Yes, that is correct."

[3] The motion for a mistrial was denied, but the defendant does not rely on this ruling as a basis for reversal.

[4] Nevertheless, the jury were twice given cautionary instructions in this regard. Before any testimony was taken on the trial day next following Columbia's challenged testimony the court instructed: "Ladies and gentlemen, before we can continue the evidence in this case, I would like to make a few remarks concerning the testimony of one of the State's witnesses, last Thursday. One of the State's witnesses—one of the police officers, in response to a question by Mr. Campbell, stated that the accused, Mr. Gunning, was originally arrested on a charge of violation of parole.

This, of course, is something that should not be considered by you, at all, in determining the guilt or innocence of this accused on this present indictment.

I must instruct you to put that remark out of your minds and to make a conscientious effort to do so and determine your verdict— arrive at your verdict based solely on the evidence presented here in the courtroom. In other words, you must accord to the accused the presumption of innocence to which he is entitled."

In addition, the final charge given at the close of all the evidence included the following remarks: "Now, one of the witnesses during the course of the trial stated that Mr. Gunning was originally arrested for a violation of parole, and I would ask you as conscious [sic] jurors to make a conscious effort to put this out of your minds. It should not be considered by you at all in determining the guilt or innocence of the accused."

fundamental constitutional right and a fair trial. See *State* v. *Evans,* supra. The rule against admitting evidence of prior crimes where such crimes are neither relevant to the state's case in chief nor appropriate for impeaching the defendant's credibility is a rule of evidence. *State* v. *Marshall,* 166 Conn. 593, 600, 353 A.2d 756 (1974). The defendant does not point to any constitutional provision or judicial opinion which would indicate that this rule of evidence is a manifestation of a fundamental constitutional right. Our review of this claim need not go further. Practice Book § 3063.

The defendant next seeks a reversal on the basis of allegedly defective instructions[5] given to the grand jury that indicted him. We need not review this claim because it was never raised during the proceedings below. See Practice Book § 3063. Practice Book § 815 (1) requires "[d]efenses or objections based on defects in the institution of the prosecution including any grand jury proceedings" to be raised by a motion to dismiss the indictment. See also Practice Book §§ 808 and 810. Moreover, we are not persuaded that the claim involves a fundamental constitutional right. See *State* v. *Evans,* supra, 70–71. Our resolution of this issue rests on an important distinction between the nature of the interest sought to be protected by grand jury pro-

---

[5] The defendant claims that these instructions did not adequately describe the crime of larceny because they omitted the element of intent to deprive another of property or to appropriate the same to himself or a third person. See General Statutes § 53a-119. Because the felony murder indictment embraced the crime of robbery, which in turn includes a larceny; see § 53a-133; the defendant argues that the failure to instruct adequately on larceny fatally taints his indictment and conviction. The grand jury was instructed that "[t]he crime of robbery, which is a felony, occurs when a person feloniously takes money, goods or other property from another by intimidating or putting the victim in fear of danger to his person."

ceedings on the one hand, and the nature of the deprivation claimed by the defendant on the other. "The purpose underlying the constitutional requirement of an indictment is 'to prevent the harassment and suffering of an innocent person by compelling him to appear in court to respond to malicious or unfounded charges.' *Kennedy* v. *Walker,* [135 Conn. 262, 270, 63 A.2d 589 (1948), aff'd, 337 U.S. 901, 69 S. Ct. 1046, 93 L. Ed. 1715 (1949)]. The purpose is achieved by interposing, between the state and the accused, a body of eighteen disinterested persons, although the agreement of only twelve of them is needed to return a true bill. General Statutes § 54-45; *Cobbs* v. *Robinson,* 528 F.2d 1331, 1338 (2d Cir. [1975]), cert. denied, 424 U.S. 947, 96 S. Ct. 1419, 47 L. Ed. 2d 354 [1976]; *State* v. *Menillo,* 159 Conn. 264, 275, 268 A.2d 667 [1970]." *State* v. *Stepney,* 181 Conn. 268, 271–72, 435 A.2d 701 (1980), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981). Because the instructions complained of; see footnote 4, supra; did not operate to impinge upon the defendant's right to be free of unfounded, malicious or harassing charges, the defendant has not demonstrated that he was deprived of a fundamental right. Thus we need not review further the effect of the instructions given to the grand jury. Practice Book § 3063.

The defendant also maintains that the instructions given by the trial court to the petit jury that rendered the verdict of guilty in this case offend the doctrine announced in *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). Although not raised at trial; see Practice Book §§ 854 and 3063; this claim is presently reviewable because it falls within the "exceptional circumstances" rule in *State* v. *Evans,* supra. *State* v.

*Vasquez,* 182 Conn. 242, 245, 438 A.2d 424 (1980). Upon review we find the court's instructions on intent[6] to be entirely free of *Sandstrom* error. See *State* v. *Brokaw,* 183 Conn. 29, 34, 438 A.2d 815 (1981); *State* v. *Arroyo,* 179 Conn. 171, 179–80, 429 A.2d 457 (1980).

The defendant next maintains that the withholding by the state of the identity of one of its witnesses along with its failure to correct inaccurate testimony by that witness deprived the defendant of a fair trial. From the briefs, it appears that the state did not disclose the identity of one of its witnesses, Enoch Durham, until March 1, 1977, a day and a half before the first witness testified in the case. Durham had given a statement to the Torrington police on October 12, 1975, the morning after the homicide. He eventually testified that while he was hitchhiking the defendant gave him a ride, that they talked about ways to make money because both were broke, that he and the defendant met later that afternoon at a bar where the victim was displaying a gun, that he and the defendant then discussed ways to get from the victim money which was kept at the victim's house, and that the defendant indicated that he had taken the victim's gun while all three were at the bar. Durham's testimony supported the state's case in that it indicated intent and motivation to commit larceny.

The defendant claims that the failure of the state to disclose Durham's identity deprived him of a fair trial. The defense sought, by way of a dis-

[6] The court charged that "[n]o one can look into a man's mind and see what his intention is. The only way to decide that question is to infer from the accused's conduct in the light of the surrounding circumstances and what he himself may have at any time said his intention was."

covery motion filed May 26, 1976, "[t]he names of any persons whom the State intends to call as witnesses in the trial of the defendant." The state responded on July 2, 1976, that these names "will be supplied prior to trial." At some point before trial a list of witnesses was supplied, but Durham's name was not on it. The defense did not learn that Durham was to testify in the case until March 1, 1977. The reason given by the state for the eleventh hour disclosure, which actually occurred during jury selection, was that the state's attorney's office had only recently learned of Durham's existence. We find this explanation totally unsatisfactory.

A subpoena dated February 24, 1977, and signed by the attorney who tried the case for the state, was issued to Durham. Thus the state knew of Durham's existence, at the latest, on Thursday, February 24, 1977. The state attempts to justify the ensuing five-day delay in notifying the defense by pointing out that in 1977 our courts operated on a Tuesday-Wednesday-Thursday schedule. Since Durham's identity presumably came to the attention of the prosecution on a Thursday, the state argues that notice given the following Tuesday, the next court day, was sufficient. We cannot agree. Practice Book § 734[7] imposes on parties to a criminal proceeding a continuing duty to disclose material previously requested. After such material comes to light, the party to whose attention it came must "promptly notify the other party and the judicial authority of its existence." Practice Book § 734. Section 734 requires notification as soon as practicable under the prevailing circumstances. In the

[7] Practice Book, 1963, § 2145, which took effect on October 1, 1976, and thus was in force at the time of trial was identical to the present § 734.

present case, where jury selection was nearly complete and testimony was about to be taken on a charge of felony murder, a five-day delay is not justified.

Moreover, we cannot hold the state entirely blameless for the delay which occurred before the state's attorney learned of Durham's existence from the Torrington police department. Assuming that the state's attorney did not know about Durham until February 24, 1977, this period amounted to sixteen months. Such ineffective communication cannot aid the defendant, the state or the administration of justice. Further, if the information withheld was either exculpatory or germane to the impeachment of a material witness; see *Giglio* v. *United States,* 405 U.S. 150, 153–54, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Calley* v. *Callaway,* 519 F.2d 184, 221 (5th Cir. 1975); we would not hesitate to impute the knowledge of the local police to the prosecution. See *Barbee* v. *Warden,* 331 F.2d 842, 846 (4th Cir. 1964); 2 Wharton's Criminal Procedure (12th Ed.) § 386.

In spite of the foregoing, however, we cannot conclude that the failure to disclose Durham's identity earlier requires a reversal of the defendant's conviction. As was the case with the three previous issues discussed, this claim was not raised during the proceedings below. If the matter had been timely raised, the trial court could have imposed one or more of the sanctions provided by Practice

Book § 747.[3] By raising this issue for the first time on appeal, the defendant seeks a most drastic sanction: reversal. Such a radical sanction is unwarranted because the record before us does not support a claim that the defendant was deprived of a fundamental constitutional right and a fair trial. See *State* v. *Evans*, supra. The defendant has not demonstrated that Durham's identity fell within the class of exculpatory, mitigating or impeaching material discussed in *Brady* v. *Maryland*, supra. To the contrary, Durham's ultimate testimony was plainly inculpatory. Under the circumstances of this case, the defendant therefore had neither a fourteenth nor a sixth amendment right to be notified in a more timely fashion that the state intended to call Durham as a witness at trial. See *United States* v. *Jordan*, 466 F.2d 99 (4th Cir. 1972), cert. denied, 409 U.S. 1129, 93 S. Ct. 947, 35 L. Ed. 2d 262 (1973); *State* v. *Festo*, 181 Conn. 254, 267, 435 A.2d 38 (1980); 2 Wharton's Criminal Procedure (12th Ed.) § 381 n.41. Furthermore, we note that the defendant never sought a continuance of the proceedings to allow him to investigate more thoroughly Durham's background or prior statements. See *State* v. *Festo*, supra. As the trial eventually unfolded, some fifteen days elapsed between the tardy disclosure and the time Durham took the

---

[3] "[Practice Book] Sec. 747. —SANCTIONS FOR FAILURE TO COMPLY

If the prosecuting authority fails to comply with Sec. 740, the judicial authority may, on motion of the defendant or on his own motion, grant appropriate relief, which may include one or more of the following:

(1) Requiring the prosecuting authority to comply;

(2) Granting the defendant additional time or a continuance;

(3) Relieving the defendant from making a disclosure required by Sec. 756, prohibiting the prosecuting authority from introducing specified evidence, or dismissing the charges; or

(4) Entering such other order as he deems proper."

stand. Finally, the defendant points to no specific harm or prejudice flowing from the tardy disclosure. Under these circumstances, the conviction is not reversible on the basis of the state's failure to notify the defense that Durham was to testify at the defendant's trial.[9]

The final claim of error concerns whether the evidence was sufficient to support the verdict. The defendant has concentrated his attack in this respect on the amount of evidence linking the use of force or intimidation to the larceny in order to prove the robbery required by the felony murder charge in this case. "To determine whether the evidence is sufficient to support a jury verdict of guilty, we review the evidence presented at trial and construe it in the manner most favorable to sustaining the verdict. *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). The issue before us is whether the jury could have reasonably concluded, from the facts established and the reasonable inferences drawn therefrom, that the evidence was sufficient to justify a verdict of guilty beyond a reasonable doubt. *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978)." *State* v. *Harris,* 182 Conn. 220, 221, 438 A.2d 38 (1980).

From the evidence introduced at trial, the jury could reasonably have found the following facts: The defendant knew that the victim kept cash in his house. Being in need of money, the defendant

---

[9] The defendant also presses as a ground for reversal the failure of the state's attorney to clear up a possible misconception with respect to when it actually learned of Durham's potential testimony. The record before us is totally inadequate to allow even cursory review of this claim because we have no way of finding facts regarding the date when Durham's existence first became known to the prosecutor. In no event could we hold that the jury were misled, because no material misrepresentation was made to them.

planned to relieve the victim of some of his money on the day of the homicide, October 11, 1975. One such scheme, involving prostitution as a means of distracting the victim while his money was taken, could not be carried out because the woman who was to serve as the distraction did not wish to go through with the plan. This woman and the defendant went so far as to spend a part of that afternoon driving around and making some phone calls in an effort to find the victim's house. While the defendant and the victim were in a bar on the afternoon of October 11, the defendant gained possession of the victim's gun, a nickel-plated Colt .45 automatic pistol. Five days earlier, the defendant was at the victim's house; he admired both the victim's gun and a plastic paperweight which the defendant thought contained $500 in cash. The defendant and the victim left the bar in separate cars at approximately 5:30 p.m. One hour and forty-five minutes later, the defendant's car was seen hurriedly leaving the victim's house with its headlights on. When the victim's wife arrived home between 11:25 p.m. and 11:30 p.m., a lawn statue that was always lighted at night had not been turned on.

The victim died sometime before 8:15 p.m. as a result of a wound caused by a bullet fired from a Colt .45 semi-automatic pistol. The plastic paperweight which produced the illusion that it contained 500 one-dollar bills, the victim's pistol and approximately $200 which was in the kitchen drawer were missing from the house. At 8 or 8:30 p.m. the defendant had a silver or chrome colored Colt .45 pistol and a plastic paperweight which looked as if it contained money. The defendant seemed angry when, upon breaking open the plastic paperweight, he discovered that it did not contain money.

Found in the victim's house that night was an empty pint bottle of whiskey and two drinking glasses that had been used recently, one of which had the defendant's fingerprints on it. A test conducted the following day on the defendant's hands revealed that the defendant had recently[10] either fired a gun or handled a gun which had not been cleaned since it had been fired.

The state in this case had the burden of proving that the defendant caused the victim's death in the furtherance of committing a robbery.[11] See General Statutes § 53a-54c (1975). The record before us is replete with evidence of the defendant's intent to commit at least a larceny. In addition ample evidence suggested that the defendant had a motive to commit larceny. "While evidence of motive does not establish an element of the crime charged; see *State* v. *Annunziato,* 169 Conn. 517, 530, 363 A.2d 1011 (1975); such evidence is both desirable and important. See *State* v. *Doucette,* 147 Conn. 95, 103, 157 A.2d 487 (1959) (overruled on other grounds in *State* v. *Tillman,* 152 Conn. 15, 20, 202 A.2d 494 (1964) ). It strengthens the state's case when an adequate motive can be shown. *State* v. *Hoyeson,* 154 Conn. 302, 307, 224 A.2d 735 (1966). Evidence tending to show the existence or nonexistence of motive often forms an important factor

---

[10] The traces of metal detected by the test would dissipate as soon as the subject washed his hands. With no washing, after one week the traces would not be detectable by the test administered.

[11] General Statutes § 53a-133 (1975) provides: "ROBBERY DEFINED. A person commits robbery when, in the course of commiting a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

in the inquiry as to the guilt or innocence of the defendant. *State* v. *Rathbun,* 74 Conn. 524, 529, 51 A. 540 (1902). This factor is to be weighed by the jury along with the other evidence in the case. *State* v. *Annunziato,* supra. The role motive plays in any particular case necessarily varies with the strength of the other evidence in the case. 'The other evidence may be such as to justify a conviction without any motive being shown. It may be so weak that without a disclosed motive the guilt of the accused would be clouded by a reasonable doubt.' *State* v. *Rathbun,* supra, 529–30." *State* v. *Harris,* 182 Conn. 220, 224, 438 A.2d 38 (1980). The evidence of intent and motive, when combined with the defendant's presence in the victim's house on the evening in question and his possession later that night of the victim's gun and paperweight, was sufficient for the jury to conclude that the defendant committed larceny.

The defendant's presence at the victim's house during the critical time frame between sometime after 5:30 p.m. and 7:15 p.m., along with his possession of a weapon of the same make and caliber as the weapon that fired the fatal shot; see *State* v. *Villafane,* 171 Conn. 644, 675, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977); supports the conclusion that the defendant caused the victim's death. Although no direct evidence that the defendant had the motive or intent to rob or kill the victim was introduced, none was required. The homicide need only occur in furtherance of the robbery. With respect to the robbery, we note that there is no distinction between direct evidence and circumstantial evidence so far as probative force is concerned. *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). The homi-

cide, if linked with the larceny, supplied ample evidence of force or intimidation indicating that a robbery had been committed.[12] We conclude that a sufficient link between the larceny and the homicide has been established in this case. As discussed above, the defendant was connected to both events. The time frame within which both events occurred was relatively narrow: less than two hours and forty-five minutes[13] elapsed between 5:30 p.m., when the victim left the bar, and 8:15 p.m., the latest time testified to by the medical examiner as the time of death. The jury could have reasonably concluded that the homicide and the larceny were sufficiently intertwined to result in the robbery required by the indictment.

There is no error.

In this opinion the other judges concurred.

---

[12] We reject the position implicitly taken by the defendant in his brief that there must be evidence of force or intimidation apart from the homicide in order to support the conviction. Our felony murder statute does not admit of such construction. See footnote 1, supra. Moreover, we note that a robbery is committed even though the only use or threat or force occurs after the taking. General Statutes § 53a-133 (1975).

[13] The record does not indicate how long it would have taken the victim to drive to this house after he left the bar at 5:30 p.m.