# STATE OF CONNECTICUT *v.* GREGORY PIERRE
## (SC 17227)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

Argued September 7, 2005—officially released January 31, 2006

*Jeremiah Donovan*, with whom was *William T. Koch, Jr.*, for the appellant (defendant).

*Peter A. McShane*, senior assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's attorney, and *Michael L. Regan*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Gregory Pierre, appeals, following our grant of certification, from the judgment of the Appellate Court affirming the judgment of the trial court convicting the defendant of two counts of kidnapping in the first degree, and one count each of felony murder, robbery in the first degree and manslaughter in the first degree. The defendant raises two issues on appeal, the first of which contains several subparts. First, the defendant claims that the Appellate Court improperly concluded that the trial court's admission of a third party's prior inconsistent statement pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986): (1) did not violate *Whelan*'s requirement of personal knowledge; (2) satisfied the requirements of the dual inculpatory statement and adoptive admission exceptions to the rule against hearsay; and (3) did not abridge the defendant's state and federal constitutional rights to confrontation. *State* v. *Pierre*, 83 Conn. App. 28, 33–42, 847 A.2d 1064 (2004). Second, the defendant claims that the Appellate Court improperly concluded that his right to counsel failed to attach upon the signing of an information by the state. Id., 32. We affirm the judgment of the Appellate Court.

As part of a six count information, the defendant was charged with capital felony in violation of General Statutes § 53a-54b, murder in violation of General Statutes § 53a-54a, felony murder in violation of General Statutes § 53a-54c,[1] two counts of kidnapping in the first degree in violation of General Statutes § 53a-92,[2] and robbery in the first degree in violation of General Statutes § 53a-134.[3] Prior to trial, the defendant moved

---

[1] General Statutes § 53a-54c provides: "A person is guilty of felony murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] General Statutes § 53a-92 (a) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and: (1) His intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

[3] General Statutes § 53a-134 (a) provides: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for,

to suppress written and oral statements obtained by the police on June 14 and 24, 1999, based upon the argument that his right to counsel had attached upon the state's signing of an information on May 13, 1999. Additionally, during the state's case-in-chief, the defendant objected to the admission for substantive purposes, pursuant to *State* v. *Whelan,* supra, 200 Conn. 743, of a prior inconsistent statement from a third party witness containing out-of-court statements that incriminated the defendant in the alleged crimes. The trial court denied the defendant's pretrial motion to suppress statements he had made to the police, and overruled his objection to the admissibility of the prior inconsistent statement of the third party. The jury subsequently found the defendant not guilty of the capital felony and the murder charges. It found the defendant guilty, however, of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55,[4] and also found the defendant guilty of felony murder, kidnapping and robbery. The trial court rendered a judgment of conviction in accordance with the jury's verdict. The defendant appealed from the judgment of his conviction to the Appellate Court. The Appellate Court rejected the defendant's claims and affirmed the

or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[4] General Statutes § 53a-55 (a) provides: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

trial court's judgment of conviction on all counts. *State* v. *Pierre*, supra, 83 Conn. App. 42. This certified appeal followed.[5]

The jury reasonably could have found the following facts. On August 22, 1998, at approximately 11 p.m., the victim, James Connor, visited his parents on their boat located at the Essex Marina. A short time later, the victim borrowed his father's car, a light colored Saab, and informed him that he was going to the Black Seal, a restaurant and bar located near the marina. The victim left the Black Seal prior to 1:30 a.m., at which point he placed a telephone call from his father's place of business to Lucky's Café (Lucky's), a bar located in New London. Between the hours of 1:30 a.m. and 2 a.m., the victim arrived at Lucky's and sought to purchase a small quantity of crack cocaine from the defendant. The defendant had arrived at Lucky's at approximately 10 p.m. with two friends, Abin Britton and Jeffrey Smith, as well as Smith's friend, Junito Jarvis. The defendant informed the victim that he did not have any drugs with him, but that he could get some from his home, which was located on Michael Road in New London. The victim offered to drive the defendant to the defendant's home in order to obtain the cocaine and then to drive

[5] We initially granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly determine that the admission by the trial court of a codefendant's statement pursuant to *State* v. *Whelan*, [supra, 200 Conn. 743], did not violate *Whelan*'s requirement of personal knowledge, satisfied the adoptive admission and dual inculpatory statement rules, and did not abridge the defendant's state and federal rights to confrontation?" *State* v. *Pierre*, 270 Conn. 916, 853 A.2d 530 (2004). Subsequently, the defendant filed a motion to reconsider our order on the petition for certification, arguing that new information had come to his attention that changed the constitutional analysis of when his sixth amendment right to counsel attached from that presented to the Appellate Court. We granted the defendant's motion for reconsideration, and granted certification to review the following additional issue: "Did the defendant's right to counsel attach upon the signing of an information by the state on May 13, 1999?"

him back to Lucky's once the transaction was complete. The defendant agreed, and instructed Smith and Britton to wait for him at Lucky's.

Shortly after the victim and the defendant left the bar, at Smith's request, Jarvis drove Britton and Smith to the defendant's home. Upon parking at the defendant's apartment building, Jarvis observed the defendant exit the building and approach another vehicle that appeared to be a light colored Saab. The defendant stood next to the driver's side window and proceeded to have a conversation with the driver of the vehicle. A short time later, Smith and Britton exited Jarvis' vehicle and joined the defendant's conversation. The defendant, Smith and Britton then entered the Saab, and a struggle ensued. Jarvis observed the defendant, Smith and Britton pull the driver out of the vehicle, then punch and kick him for several minutes. All three individuals loaded the driver of the Saab into the backseat, at which point they reentered the vehicle, and the defendant drove the Saab out of the housing development. Jarvis did not see the defendant, Britton or Smith again that evening and subsequently drove his own vehicle home. When Jarvis visited Smith at his apartment several days later, Smith revealed several additional details about the incident. Specifically, Smith stated that the individual whom Jarvis had observed in the Saab died after Britton had choked him and hit him in the face with a pipe. Smith also expressed concern to Jarvis over where he, the defendant and Britton had buried the body and asked for assistance from Jarvis in buying concrete in order further to conceal any evidence of the incident. Jarvis refused to provide Smith with any assistance, and never spoke about the incident with him again.

On August 23, 1998, at approximately 6:30 a.m., Harrison Fortier, a sergeant with the Waterford police department, was called upon to investigate a Saab that was partially submerged in the town's duck pond. When

Fortier arrived at the scene, the driver's side door of the car was open, the transmission was in neutral, the keys were missing, and the parking brake was disengaged. In addition, there were bloodstains throughout the interior of the vehicle. A search of motor vehicle records revealed that the Saab was registered to Donald Connor, the victim's father. Upon further examination of the vehicle, the police also discovered two palm prints, which Christopher Grice, a criminalist for the state forensic laboratory, later identified as matching Britton's palms. Additionally, a further review of the vehicle's contents revealed that four chrome plated brass pipes were missing from the Saab's trunk. Among the items found in the car was a card for Lucky's, with the handwritten number that the victim had called the previous evening.

On January 10, 1999, the badly decomposed remains of a body were found in Bates Woods, a recreation area in New London located across from Michael Road, where the defendant lived. Upon examining the skull found at the scene, Harold Wayne Carver II, chief medical examiner for the state of Connecticut, identified the remains as belonging to the victim and classified the manner of death as a homicide.

On two separate occasions, one in the fall of 1998, and the other in the late winter of 1999, Amanda Blackmon, a friend of the defendant, Britton and Smith, overheard conversations in which the defendant made incriminating statements regarding the victim's death. Specifically, on October 31, 1998, Blackmon attended a party with all three individuals, and during an unrelated disturbance at the party, she heard the defendant say, "Fuck them niggers. We'll kill them and bury them too." Similarly, in February, 1999, at a birthday party that Blackmon attended with the defendant, Britton and Smith, she observed that at one point during the party Britton looked as if he were depressed and had been

crying. She then overheard the defendant tell Britton that "if he keep[s] his mouth shut, the cops had nothing on them."

During the course of their investigation into the victim's death, the police questioned the defendant several times and obtained several written and oral statements from him. Initially, the defendant met with Detective Anthony Buglione, of the Connecticut state police, on February 10, 1999, and provided a written statement after being advised of and waiving his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). As part of this statement, the defendant denied playing any role in the incident or having any information regarding involvement by Britton or Smith. Buglione met with the defendant once again on March 1, 1999, at which point Buglione advised the defendant of his *Miranda* rights. The defendant provided a second written statement to police, now acknowledging that he had met the victim at Lucky's with Britton and Smith, and that he had agreed to sell the victim crack cocaine. The defendant stated that the victim had driven him to the defendant's home in order to complete the transaction, and that the victim had waited outside in his Saab while the defendant went upstairs to get the drugs out of his apartment. The defendant next claimed that, as he was coming out of his apartment, he observed Britton beat the victim, throw him into the back of the Saab, and drive away. The defendant further claimed that he never saw the victim again, but that the victim was alive when Britton left the defendant's apartment building.

On March 8, 1999, the defendant met with Detective James McGlynn, of the Connecticut state police, and Detective David Gigliotti, of the New London police department, in his home, where he provided them with a third written statement after again having been advised of and waiving his *Miranda* rights. In particular,

the defendant told the detectives that, when he was returning to the parking lot to complete the drug transaction, he could see both Smith and Britton beating the victim. The defendant claimed that Britton later told him that after beating the victim in the parking lot, he and Smith took the victim in his Saab to Bates Woods, beat him some more, and then left him for dead. Additionally, the defendant told McGlynn and Gigliotti that he later had learned that, upon returning a few hours later, Britton and Smith found the victim still alive, at which point Britton killed the victim by shoving a pipe into the victim's mouth. Britton and Smith then dragged the victim's body into the woods and covered it with a black plastic bag, garbage and dirt. The defendant also informed the police that the only other person who knew about the murder was Norman Carr, a friend of the defendant, Britton and Smith, because Britton had told Carr about the murder while all four men were working together at Quality Cleaners.

On May 13, 1999, the police obtained a warrant for the defendant's arrest in connection with the victim's murder. The police eventually apprehended the defendant on June 14, 1999, in Garden City, New York. While in custody, the defendant gave yet another written statement to the police after having been advised of and waiving his *Miranda* rights. In this statement, although the defendant maintained that Britton and Smith were the ones who had beaten the victim in the parking lot of the defendant's home, he acknowledged that he had assisted in loading the victim into the back of the Saab and that he had accompanied Britton and Smith to Bates Woods. The defendant told police that Britton had stripped the victim completely naked and proceeded to beat the victim with a silver pipe that Britton had found in the trunk of the Saab. As part of this statement, the defendant claimed that he left Bates Woods separately from Britton and Smith, and that Britton later informed

him that he and Smith had returned to Bates Woods in the very early morning and had discovered that the victim was still breathing. The defendant told police that Britton later confessed to him that he had killed the victim by shoving a pipe into the victim's mouth, and that Britton and Smith subsequently disposed of the victim's body in Bates Woods by dragging it out of view, pouring bleach on it to conceal the smell, and covering it with black plastic bags.

The jury returned a verdict of guilty on the felony murder, kidnapping and robbery counts, and also found the defendant guilty of the lesser included offense of manslaughter in the first degree. Thereafter, the trial court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of eighty-five years imprisonment. Additional facts and procedural history will be set forth as necessary.

I

ADMISSIBILITY OF PRIOR INCONSISTENT
STATEMENT OF THIRD PARTY

We first address the defendant's claim that the Appellate Court improperly concluded that the trial court properly had admitted for substantive purposes, pursuant to *State* v. *Whelan*, supra, 200 Conn. 743, a prior inconsistent statement from a third party witness containing out-of-court statements that incriminated the defendant. Specifically, the defendant contends that certain out-of-court statements made by Britton referred to within the prior inconsistent statement of Carr should not have been deemed admissible because the admission of Carr's prior inconsistent statement: (1) violated *Whelan*'s requirement that the declarant have personal knowledge of the incident; (2) failed to satisfy the requirements of the dual inculpatory statement and adoptive admission exceptions to the rule

against hearsay; and (3) abridged the defendant's state and federal constitutional rights to confront the witnesses against him. We disagree.

The following additional facts relevant to this claim are set forth in the opinion of the Appellate Court. "The state called [Carr] as a witness during its case-in-chief. Carr was friendly with the defendant and the two codefendants, [Britton] and [Smith]. On February 16, 1999, Carr provided the state police with a seven page written statement at his attorney's office, describing certain incriminating statements made by Britton and the defendant in Carr's presence."[6] *State* v. *Pierre*, supra,

[6] In Carr's written statement to police, he said that he "overheard [Britton] and [the defendant] talking about the murder of [the victim]. I asked [Britton] and [the defendant] what were they talking about.

"[Britton] then told me that a guy came to [Lucky's]. [Britton] said that he and the guy left the bar and went into the guy's gray colored Saab. [Britton] said that [the defendant], [Smith], and [Jarvis] also left the bar at this time. [Britton] said that [the defendant], [Smith], and [Jarvis] followed them in [Jarvis'] blue colored vehicle. They decided that they were going to get the guy some crack from [the defendant's] apartment on Michael Road in New London. [Britton] stated that as they arrived at [the defendant's] apartment, they both parked their vehicles in the parking lot near [the defendant's] apartment. [The defendant] then said that he went upstairs to his apartment to get the guy some crack and when he returned, they—[Britton] and [Smith]—were beating on the guy. [The defendant] stated that he was real nervous because his neighbors are real nosey, and that they may have been watching from their window.

"[Britton] and [the defendant] then said that after they beat the guy, they put the guy back inside the Saab and drove him to Bates Woods behind the dog pound. [Britton] and [the defendant] then said that once they arrived at Bates Woods parking lot, they took the guy out from the car and again started to beat on him. [Britton] started to brag and said that he took a pole and placed it into the guy's mouth. [Britton] said that he really jammed the pole down his throat and then twisted the pole to break his neck. [Britton] said that prior to doing this with the pole, the guy was still alive but after he did this, the guy died immediately. [Britton] stated that after he broke the guy's neck, he took the pole and threw it into the woods. [Britton] stated that after a couple of days, he went back to Bates Woods and took the pipe out from the woods so there would be no evidence left at the scene.

"[Britton] continued by stating that after they killed the guy, they dragged his body into the woods. They tried to bury his body but the ground was too cold, so they took some type of tarp and covered his body. They were

83 Conn. App. 33. "Carr's statement was a description of what he heard the defendant and Britton say about the victim's homicide. Carr stated that the conversation took place sometime in the summer of 1998, possibly late August or September, when he, the defendant and Britton sat in the back of a company van while returning from a work site. According to Carr's statement, Britton began by describing how the victim came into [Lucky's], attempting to purchase some crack cocaine. Britton said that he drove with the victim in the victim's Saab to the defendant's apartment in New London to execute a drug sale. The defendant, Smith and [Jarvis] followed them in a separate car. [As described in detail in footnote 6 of this opinion] Carr's statement provided, in relevant part, as follows . . . '[Britton] and [the defendant] then said that after they beat the guy, they put the guy back inside the Saab and drove him to Bates

able to place rocks over the tarp to hold the tarp down. [Britton] stated that they then threw and kicked dirt over the tarp to cover everything up. I also remember [Britton] stating that prior to placing a tarp over his body, they were able to drag his body into a ditch.

"[Britton] stated that they were able to take $90 from the guy, that the guy had a diamond wristwatch but during this beating, the diamonds fell off the watch and the watch was broken. I do not know if anyone took his broken watch.

"[Britton] and [the defendant] then said that after they buried the guy, they took his Saab and dumped it inside a pond in Waterford. From there they were picked up by [Smith's] exgirlfriend, Melanie. Melanie is a white female who drives a burgundy colored Saturn. She works as a switchboard operator at L&M Hospital. Melanie and [Britton's] wife, Shahida Britton, are very close friends. . . .

"During this car ride home from work, [Britton] and [the defendant] were doing all the talking about the facts in the murder. [Smith] appeared to be upset that they were actually telling me all of this information.

"One thing that puzzles me, was that I saw on the television that the police have indicated that [the victim] died as a result of [two] gunshots to his head. From the information I heard, there was never a gun involved, [the victim] died from [Britton] breaking his neck. . . .

"I also want to add that when [Britton] and [the defendant] were mentioning how they buried [the victim], they said before they actually buried him, they threw bleach over his body and clothes, to wash away any possible fingerprints."

Woods behind the dog pound. [Britton] and [the defendant] then said that once they arrived at Bates Woods parking lot, they took the guy out from the car and again started to beat on him. [Britton] started to brag and said that he took a pole and placed it into the guy's mouth. [Britton] said that he really jammed the pole down his throat and then twisted the pole to break his neck. [Britton] said that prior to doing this with the pole, the guy was still alive but after he did this, the guy died immediately.' " Id., 33–34 n.4.

"During his testimony at trial, however, Carr insisted that he never had heard Britton or the defendant discuss the killing of the victim. He maintained that any assertion to the contrary in his February 16, 1999 written statement to the police was false." Id., 33–34. "Carr testified that he had known the defendant and Britton for approximately two years before the summer of 1998. Carr described himself as friendly with both men and testified that they all had socialized and worked together. He testified that he had frequented [Lucky's] in New London, where the victim sought to purchase crack cocaine on August 23, 1998. He also testified that he had visited the defendant's apartment on Michael Road." Id., 35–36.

The jury reasonably could have found the following additional facts. With respect to Carr's written statement, Carr required that he be interviewed by McGlynn and Gigliotti at the office of his attorney, Peter Rotella, and that his attorney be present while he gave his statement to the police. At the conclusion of the police interview, Carr carefully reviewed the written summary prepared by McGlynn, edited portions of it with the assistance of McGlynn and, prior to signing it, met privately with his attorney for approximately twenty minutes. After meeting with his attorney in private, Carr and the investigating detectives all signed each page of

the statement in the presence of Carr's attorney, thus attesting to the statement's accuracy.

When Carr took the stand at trial, he acknowledged having met with police at his attorney's office and that the police had prepared a written statement for his review. He confirmed that his signature was on each page of the written statement that had been presented to him by the police, but denied ever actually having reported the incident to the police as was memorialized in his written statement. Rather, Carr testified that the police had pieced the statement together from other sources and presented it as a finished document for him to sign. Additionally, Carr acknowledged that he had ridden with the defendant and Britton in the back of a van while working with them at Quality Cleaners, but claimed that he did not remember having had a prolonged conversation with either individual while returning from the job site. Similarly, during cross-examination, Carr claimed that he did not remember either Britton or the defendant having made any of the statements referred to in his written statement to the police.

A

Personal Knowledge Requirement of *Whelan*

Before turning to the merits of the defendant's first claim, we set forth the standard of review. "The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the . . . discretion of the trial court." *State* v. *Newsome*, 238 Conn. 588, 596, 682 A.2d 972 (1996). "[T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal

quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 791, 785 A.2d 573 (2001).

"In *State* v. *Whelan*, supra, [200 Conn. 751–53] we reviewed our continued adherence to the traditional rule prohibiting the use as substantive evidence of a prior inconsistent out-of-court statement of a nonparty witness. We rejected the traditional view and joined the growing number of jurisdictions that allow prior inconsistent statements as substantive evidence when the declarant takes the stand and is available for cross-examination. . . . In deciding to abandon the common law rule, we relied on the assessment of various legal scholars and commentators that the reasons behind the rule do not apply when the witness testifies and is available for cross-examination: [W]hen the declarant is available for cross-examination the jury has the opportunity to observe him as he repudiates or varies his former statement. The cross-examination to which a recanting witness will be subjected is likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. . . . The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither. . . . Quite simply, when the declarant is in court, under oath, and subject to cross-examination before the factfinder concerning both his out-of-court and in-court statements, the usual dangers of hearsay are largely nonexistent. . . . These considerations convinced us that the prevailing reasons for refusing to allow any prior inconsistent statement to be used as substantive evidence are no longer valid. . . . We concluded that an exception to the hearsay

rule is necessary to allow the trial court to admit for substantive purposes prior inconsistent statements given under prescribed circumstances reasonably assuring reliability. . . . We therefore adopted a rule allowing the substantive use of prior written inconsistent statements where the declarant: (1) has signed the statement; (2) has personal knowledge of the facts stated; and (3) testifies at trial and is subject to cross-examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Grant*, 221 Conn. 93, 98–99, 602 A.2d 581 (1992). This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided. See *State* v. *Corbin*, 260 Conn. 730, 737 n.5, 799 A.2d 1056 (2002); Conn. Code Evid. § 8-5 (1), commentary.

The defendant first asserts that Carr's prior inconsistent statement should have been deemed inadmissible because it does not satisfy the requirement set forth in *State* v. *Whelan*, supra, 200 Conn. 753, that the declarant have "personal knowledge of the facts stated . . . ." Specifically, the defendant claims that Carr's statement is inadmissible because it was not reflective of any personal knowledge Carr had of the facts underlying what was told to him. The defendant's argument relies on the reasoning and the rule of law set forth in *State* v. *Green*, 16 Conn. App. 390, 399, 547 A.2d 916, cert. denied, 210 Conn. 802, 553 A.2d 616 (1988), in which the Appellate Court concluded that, "in order for a prior inconsistent statement containing statements of a third party to be admissible as substantive evidence the declarant must have personal knowledge of the facts underlying the statement and not just personal knowledge that the statement was made."

Contrary to the defendant's argument, we have on multiple occasions rejected the Appellate Court's inter-

pretation of the *Whelan* "personal knowledge" require-
ment. Most notably, in *State* v. *Grant*, supra, 221 Conn.
99, we concluded "that the personal knowledge prong
of the *Whelan* rule does not require that the declarant
have witnessed the commission of the crime that is the
subject of the prior inconsistent written or recorded
statement." (Internal quotation marks omitted.) Addi-
tionally, we have noted that "[i]f the substance of the
prior inconsistent statement of a witness is an admis-
sion made by the defendant to the witness, the witness
has 'personal knowledge' of that admission, within the
meaning of *Whelan*. Thus, as long as the witness' state-
ment meets the other requirements for admissibility
under *Whelan*, and the words spoken by the defendant
to the witness, as related in the witness' prior statement,
would be admissible as an admission by the defendant
if testified to by the witness, the 'personal knowledge'
prong of *Whelan* is satisfied." *State* v. *Woodson*, 227
Conn. 1, 22, 629 A.2d 386 (1993).

The defendant conceded at oral argument before this
court that *Grant* and *Woodson* reject *Green*'s require-
ment that personal knowledge must be knowledge of
the facts underlying the statement. Essentially, the
defendant is asking us to overrule our prior holdings
in *Grant* and *Woodson*, and to retreat to the interpreta-
tion of the personal knowledge requirement espoused
by the Appellate Court in *Green*. We are not inclined
to do so, particularly in light of the fact that, as noted
previously, the *Whelan* rule and all of the developments
and clarifications of the rule that have occurred since
*Whelan* was decided, have been codified in § 8-5 (1) of
the Connecticut Code of Evidence.[7]

---

[7] Section 8-5 of the Connecticut Code of Evidence provides in relevant
part: "The following are not excluded by the hearsay rule, provided the
declarant is available for cross-examination at trial:

"(1) Prior inconsistent statement. A prior inconsistent statement of a
witness, provided (A) the statement is in writing, (B) the statement is signed
by the witness, and (C) the witness has personal knowledge of the contents
of the statement. . . ."

The judges of the Superior Court adopted the Connecticut Code of Evidence (code) in June, 1999, with the intent of codifying Connecticut evidentiary case law. See D. Borden, "The New Code of Evidence: A (Very) Brief Introduction and Overview," 73 Conn. B.J. 210, 211–12 (1999). Significantly, "the [c]ode cannot be properly understood without reference to the accompanying [c]ommentary. The [c]ommentary provides the necessary context for the text of the [c]ode, and the text of the [c]ode expresses in general terms the rules of evidence that the cases cited in the [c]ommentary have established." Id., 212. Additionally, "the [j]udges took an unusual step when they formally adopted the [c]ode. Unlike other situations, in which the [j]udges, when voting on rules, are guided by but do not formally adopt the commentary submitted by the [r]ules [c]ommittee that normally accompanies proposed rule changes, in adopting the [c]ode the [j]udges formally adopted the [c]ommentary as well. This is the first time that the [j]udges have done so. Thus, the [c]ode must be read together with its [c]ommentary in order for it to be fully and properly understood." Id., 213. Therefore, the personal knowledge prong of the *Whelan* rule, as codified by the requirements of § 8-5 (1) (C) of the code, must be understood as also incorporating our holdings in *Grant* and *Woodson.*

Furthermore, when evaluating whether the requirements of the personal knowledge requirement have been met, we are mindful that the requirement was included in the *Whelan* rule at least in part to ensure that the statement was trustworthy and reliable. In deciding *Whelan,* we "emphasized that a prior inconsistent statement had to be given under circumstances ensuring its reliability and trustworthiness in order to be admissible. We therefore declined to allow prior oral statements of a witness to be used as substantive evidence, limit[ing] substantive admissibility of prior inconsistent state-

ments to situations in which the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced. . . . While we noted that the requirement that prior statements be written and signed is not an absolute guaranty of reliability, it does provide significant assurance of an accurate rendition of the statement and that the declarant realized it would be relied upon." (Citation omitted; internal quotation marks omitted.) *State* v. *Grant*, supra, 221 Conn. 100. Furthermore, we are mindful of the fact that "a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes. We emphasize, however, that the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill." *State* v. *Mukhtaar*, 253 Conn. 280, 306–307, 750 A.2d 1059 (2000).

Applying this reasoning in the context of the present case, we note that Carr's written statement to the police bears several indicia of reliability that weigh in favor of admitting it into evidence, and permitting the jury to determine for itself whether to credit Carr's trial testimony, his prior inconsistent statement, or neither. First, at Carr's insistence, his statement was taken at his

attorney's office, and his attorney was present during police questioning. Additionally, Carr reviewed his written statement with his attorney for approximately twenty minutes and then signed the document in eight different places, thus greatly reducing the threat of coercion or undue influence. Furthermore, Carr indicated that he was giving the statement of his own free will, and by allowing his conversation with the police to be recorded, it is reasonable to conclude that he understood that the statements likely would be relied upon in a subsequent prosecution. See *State* v. *Woodson*, supra, 227 Conn. 23. Moreover, we note that making false statements to the police could have subjected Carr to criminal prosecution, thus placing further incentive for Carr to report truthfully and accurately what was told to him by Britton and the defendant. See General Statutes § 53a-157b; *State* v. *Woodson*, supra, 227 Conn. 23. In light of all of these considerations, we conclude that Carr's written statement to police had sufficient indicia of reliability to warrant admission.

Finally, we have not located any precedent from other jurisdictions that suggests a retreat from our holdings in *Grant* and *Woodson* is warranted. In reaching this conclusion, we are mindful of the fact that some jurisdictions have decided to adopt a "personal knowledge" standard more akin to the rule set forth by the Appellate Court in *State* v. *Green*, supra, 16 Conn. App. 400, wherein it is necessary to demonstrate that the declarant had personal knowledge of the facts underlying the statement that was made.[8] By contrast, however, some

[8] See, e.g., *People* v. *Candelaria*, 107 P.3d 1080, 1086 (Colo. App. 2004) ("[f]or the evidence to be used for both purposes, the witness, while testifying, must be given the opportunity to explain or deny the statement, or must still be available to give further testimony in the trial, and the previous inconsistent statement must relate to a matter within the witness's own knowledge"); *People* v. *Bueno*, 358 Ill. App. 3d 143, 157, 829 N.E.2d 402 (2005) ("[f]or a witness to have personal knowledge, the witness must have observed, and not merely heard, the subject matter underlying the statement"); *People* v. *Morgason*, 311 Ill. App. 3d 1005, 1011, 726 N.E.2d 749

jurisdictions appear not to have implemented a personal knowledge standard, opting instead for a standard that hinges more upon whether the defendant is in court and subject to cross-examination.[9] In short, we are not aware of the development of such a consensus in favor of requiring the declarant to have personal knowledge of the facts underlying his statement that would argue in favor of revisiting and possibly reversing our prior rejection of such a standard.

The defendant's remaining claims with respect to the admissibility of Carr's prior inconsistent statement center on two issues. First, the defendant claims that Carr's statement actually contains hearsay within hearsay, and that the trial court improperly concluded that Britton's statements recounted within Carr's statement to the police were admissible under the dual inculpatory statement and adoptive admission exceptions to the rule against hearsay. Second, the defendant claims that the admission of Carr's statement unconstitutionally abridged his right to confront the witnesses against him. We now address each of these claims in turn.

---

(2000) (referencing fact that § 5/115-10.1 of the 725 Illinois Comp. Stat. Ann. [West 1993] allows admission of witness' prior inconsistent statement as substantive evidence when statement explains event of which witness had personal knowledge, but noting that "personal knowledge" excludes statements, including admissions, made to witness by third party, where witness has no firsthand knowledge of event that is subject of statements made by third party).

[9] See, e.g., *People* v. *Freeman,* 20 Cal. App. 3d 488, 493, 97 Cal. Rptr. 717 (1971) ("Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." [Internal quotation marks omitted.] Section 770 of the California Evid. Code [Deering 2004] requires only that "[a] The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [b] The witness has not been excused from giving further testimony in the action."); *Sharpe* v. *State,* 272 Ga. 684, 686, 531 S.E.2d 84 (2000) ("[a] prior inconsistent statement is inadmissible in the absence of some showing that the witness who testified inconsistently at trial either had personal knowledge or had received information directly from one of the defendants themselves").

## B

### Admissibility of Hearsay within Carr's Prior Inconsistent Statement

"The law regarding out-of-court statements admitted for the truth therein is well settled. An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Rivera*, 268 Conn. 351, 360, 844 A.2d 191 (2004), quoting *State* v. *Merriam*, 264 Conn. 617, 633, 835 A.2d 895 (2003).

Carr's written statement to police contains two levels of hearsay. First, Carr's written statement itself constitutes hearsay because it is a statement that differs from the one made by Carr while testifying at trial that was offered into evidence for the truth of the matter asserted. See Conn. Code Evid. § 8-1 (3). Second, contained within Carr's written statement to police are the alleged statements made to Carr by Britton detailing the participation of Britton and the defendant in the victim's murder. "Hearsay within hearsay is admissible only if each part of the combined statements is independently admissible under a hearsay exception." Conn. Code Evid. § 8-7; see also *State* v. *Lewis*, 245 Conn. 779, 802, 717 A.2d 1140 (1998) ("[w]hen a statement is offered that contains hearsay within hearsay, each level of hearsay must itself be supported by an exception to the hearsay rule in order for that level of hearsay to be admissible"); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988 & Sup. 1998) § 11.14.5, pp. 229–30 and p. 389; 2 C. McCormick, Evidence (4th Ed. 1992) § 324.1, pp. 368–70. Therefore, in order for the full content of Carr's written statement to police to be admissible for substantive purposes, the statement itself must not only be admissible under the *Whelan* rule, as dis-

cussed in part I A of this opinion, but the statements made to Carr by Britton linking himself and the defendant to the victim's murder must be admissible in their own right under separate hearsay exceptions.

The state contends that Britton's statements to Carr, as memorialized in Carr's written statement to the police, properly were admitted into evidence against the defendant as a dual inculpatory statement and an adoptive admission. The defendant claims that, even if Carr's statement meets the personal knowledge standard and fulfills all of the other prongs of *Whelan* as an admissible prior inconsistent statement, it did not satisfy the requirements of the dual inculpatory statement and adoptive admission exceptions to the rule against hearsay. Specifically, the defendant attempts to discredit the reliability and trustworthiness of Britton's admissions to Carr by claiming that Carr's statement was not articulated with sufficient precision to allow one to determine whether Britton, the defendant, or Smith was actually the individual carrying out the crime. Consequently, the defendant argues, it is impossible to determine whether Britton was making a statement against his penal interest, or merely reporting on someone else's conduct. Similarly, in light of this confusion, the defendant contends that one cannot conclude that the defendant intended to adopt Britton's confession as his own. We are not persuaded. After reviewing Carr's written statement to police; see footnote 6 of this opinion; we agree with the state that a fair reading of the written statement, viewed through the lens of common sense, makes it abundantly clear that the statements attributed to Britton subject both Britton and the defendant to criminal liability. In our estimation, the defendant's argument focuses on discreet passages of the statement, searching for slight vagaries in language that, when viewed in isolation, confuse what is clear when the statement is read as a whole.

In light of our previous conclusion, we agree with the state that Carr's prior inconsistent statement is admissible under *Whelan*, and that Britton's statements to Carr inculpating both himself and the defendant are independently admissible under separate hearsay exceptions. Specifically, as explained further in part I B 1 and 2 of this opinion, Britton's statements to Carr are admissible as statements against Britton's penal interest, and the details of Britton's statement inculpating the defendant are admissible against the defendant as adoptive admissions. We note, however, that in light of our previous holding in *State* v. *Woodson*, supra, 227 Conn. 22, wherein we stated that "[i]f the substance of the prior inconsistent statement of a witness is an admission *made by the defendant to the witness*, the witness has 'personal knowledge' of that admission, within the meaning of *Whelan*"; (emphasis added); our conclusion regarding admissibility is dependent on the fact that the defendant also was present while Britton made his statements against penal interest to Carr. As discussed in more detail in part I B 2 of this opinion, we conclude that the defendant's failure to object to the statements made by Britton linking him to the victim's murder qualifies under the adoptive admission exception to the rule against hearsay, thus permitting the inference that the defendant was adopting Britton's statements as his own. In this sense, the admissibility of Britton's statements against the penal interest of the defendant are still within the personal knowledge requirements of *Woodson* because, by way of the defendant's adoption of Britton's statements, it is as if the "words [were] spoken by the defendant to the witness" himself. Id. By contrast, if the defendant had not been present when Britton made his statements against penal interest to Carr, the defendant would not have had the opportunity to adopt those statements. Consequently, Britton, rather than the defendant, would have been

the only individual making statements to the witness that inculpated the defendant, thus possibly requiring a further extension of the personal knowledge prong of *Whelan* beyond our holding in *Woodson*. We need not reach this question, however, because, within the context of this case, the defendant was present when Britton's statements against penal interest were made and the defendant can be deemed to have adopted Britton's admissions to the witness as his own.

1

### Britton's Statements Against Penal Interest

The state offered Britton's statement to Carr as a dual inculpatory statement, which is "a statement that inculpates both the declarant and a third party, in this case the defendant." *State* v. *Schiappa*, 248 Conn. 132, 145 n.15, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). A dual inculpatory statement is admissible as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence, which "carves out an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant if the statement at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." (Internal quotation marks omitted.) Id., 148–49; id. (construing rule 804 [b] [3] of Federal Rules of Evidence, federal analog to § 8-6 [4] of Connecticut Code of Evidence). In short, the admissibility of Britton's statements to Carr hinges on whether his statements were against his own penal interest and whether they were sufficiently trustworthy. The fact that Britton's statements also inculpate the defendant make Britton's statements relevant with respect to the defendant, but do not make the statements admissible against the defendant in their own right. Therefore, we

first examine whether Britton's statements to Carr are sufficiently trustworthy in order to meet the requirements of a statement against penal interest.

"In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 361; Conn. Code Evid. § 8-6 (4). Additionally, when evaluating a statement against penal interest, "the trial court must carefully weigh all of the relevant factors in determining whether the statement bears sufficient indicia of reliability to warrant its admission." *State* v. *Schiappa*, supra, 248 Conn. 154. As we previously have stated, when viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discretion. Id., 155.

A review of the factors considered by the trial court when weighing the admissibility of Britton's statement to Carr leads us to conclude that the Appellate Court properly concluded that the trial court did not abuse its discretion.[10] First, we conclude that Britton's statement to Carr was squarely against his penal interest.[11]

---

[10] Due to Britton's decision to exercise his fifth amendment right against self-incrimination, it is undisputed that he was unavailable at trial. Therefore, the focus of our analysis is on whether Britton's statement was sufficiently trustworthy to warrant admission as a statement against his penal interest.

[11] As reported in Carr's written statement to police, Britton's most damaging statements against himself and the defendant include the following: "[Britton] and [the defendant] then said that after they beat the guy, they put the guy back inside the Saab and drove him to Bates Woods behind the dog pound. [Britton] and [the defendant] then said that once they arrived at Bates Woods parking lot, they took the guy out from the car and again started to beat on him. *[Britton] started to brag and said that he took a pole and placed it into the guy's mouth. [Britton] said that he really jammed the pole down his throat and then twisted the pole to break his neck. [Britton] said that prior to doing this with the pole, the guy was still alive but after he did this, the guy died immediately. [Britton] stated that after*

Although Britton implicated the defendant in the homicide, he clearly admitted his own participation in the crime by reference to the fact that he "really jammed the pole down [the victim's] throat and twisted the pole to break his neck." In particular, Britton acknowledged that "prior to doing this with the pole, the guy was still alive but after he did this, the guy died immediately." Moreover, there is nothing to suggest that Britton was attempting to shift blame to the defendant or to otherwise minimize his own criminal involvement. See *State* v. *Schiappa*, supra, 248 Conn. 155 ("[a]lthough declarations such as we killed [him] could be viewed as an attempt to share blame, they could not reasonably be seen as an attempt to shift blame away from [the declarant] because [such] assertions [implicate the declarant] fully and equally in the [crime]" [internal quotation marks omitted]), quoting *State* v. *Hallum*, 585 N.W.2d 249, 255 (Iowa 1998).

Second, the circumstances under which Britton allegedly made his statements to Carr were strongly indicative of their reliability. Specifically, Britton made the statements on his own initiative, to an individual who was a friend and someone he routinely socialized with,

he broke the guy's neck, he took the pole and threw it into the woods. [Britton] stated that after a couple of days he went back to Bates Woods and took the pipe from the woods, so there would be no evidence left at the scene.

"[Britton] continued by stating that after they killed the guy they dragged [the victim's] body into the woods. They tried to bury his body but the ground was too cold, so they took some type [of] tarp and covered his body. They were able to place rocks over the tarp to hold the tarp down. [Britton] stated that they then threw and kicked dirt over the tarp to cover everything up. . . .

"[Britton] and [the defendant] then said that after they buried the guy, they took his Saab and dumped it inside a pond in Waterford. . . .

"I also want to add that when [Britton] and [the defendant] were mentioning how they buried [the victim], they said before they actually buried him, they threw bleach over his body and clothes, to wash away any possible fingerprints." (Emphasis added.)

and not "in the coercive atmosphere of official interrogation . . . ." (Internal quotation marks omitted.) *State v. Rivera*, supra, 268 Conn. 369. Such statements are significantly more trustworthy than statements obtained by government agents for the purpose of creating evidence that would be useful at a future trial. Id., 370. In short, neither facing arrest nor being under arrest when making his statements to Carr, Britton lacked the obvious incentive to shift blame or curry favor with the police. Id. Additionally, although Carr was not a relative of Britton or the defendant, a factor that we have previously noted when evaluating whether a statement is trustworthy, the trial court specifically found that Carr was far from a stranger either. Carr testified that he had known Britton, the defendant and Smith for a couple of years, that they were friends, and that they regularly socialized together. Although the trial court correctly acknowledged that the relationship of trust between Britton and Carr was not necessarily as strong as if Britton and Carr were blood relatives, the fact remains that they shared a friendship and a relationship of trust. Consequently, there was no abuse of discretion in the trial court's conclusion that the relationship was sufficient to balance in favor of a finding of reliability. See id., 369 ("speaking to acquaintances unconnected to law enforcement makes statements eminently trustworthy"), citing *United States* v. *York*, 933 F.2d 1343, 1362–63 (7th Cir.), cert. denied, 502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991).

Third, the timing of Britton's statement against penal interest further bolsters its reliability. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 317, 757 A.2d 542 (2000). In the present case, Britton made his statements to Carr

in late August or September, 1998, just a couple of weeks after the homicide, thus suggesting that the details of each individual's participation in the incident were still fresh in Britton's mind. See, e.g., *State* v. *Rivera*, supra, 268 Conn. 370 (statements made within five months of homicide deemed trustworthy); *State* v. *Gold*, 180 Conn. 619, 634, 431 A.2d 501 (confession made within three months of murders trustworthy), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

Fourth, there is an abundance of other evidence strongly corroborating the truthfulness of Britton's statement against his penal interest. In particular, the defendant's own statements to police told a very similar story about how the victim died after Britton shoved a pipe down his throat, and also specifically acknowledged that Britton had told Carr about the details of the incident while the three of them were returning from a work site. Additionally, the defendant's statement to police and the fact that a card for Lucky's was found in the victim's Saab corroborated Britton's claim that the victim had come to Lucky's in search of drugs. Furthermore, Britton stated that he and the defendant drove the victim's Saab, attempted to deposit the Saab in the Waterford pond, and buried the victim in Bates Woods. The police investigation revealed both the Saab and the victim's body in precisely those locations. Moreover, Britton stated that he and the defendant beat the victim in the parking lot of the defendant's home after meeting the victim to sell him cocaine. Jarvis testified that he observed Britton and the defendant beat the victim in that same parking lot, load him into the back of his Saab, and drive off in the direction of Bates Woods. Finally, Blackmon testified that she overheard a conversation between Britton and the defendant wherein the defendant exclaimed: "Fuck them niggers. We'll kill them and bury them too." These statements

further corroborated Britton's statement that both he and the defendant beat the victim and disposed of his body. In light of all of the preceding factors, we conclude that Britton's statements to Carr were trustworthy statements against his penal interest.

### 2

### Adoptive Admissions by the Defendant

Connecticut also recognizes an exception to the rule against hearsay when an individual is deemed to have adopted the admission of another party. "When a party's conduct indicates that the party assents to or adopts a statement made by another person, the statement is admissible against the party." C. Tait & J. LaPlante, supra, § 11.5 (d) (6). Specifically, "[w]here hearsay accusations are sought to be introduced as evidence against a defendant in a criminal proceeding on grounds that the hearsay was adopted by the defendant . . . the trial court must first determine that the asserted adoptive admission be manifested by conduct or statements which are unequivocal, positive, and definite in nature, clearly showing that in fact [the] defendant intended to adopt the hearsay statements as his own." (Internal quotation marks omitted.) *State* v. *Moye*, 199 Conn. 389, 393, 507 A.2d 1001 (1986). Generally, "statements made within the accused's hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak and the circumstances naturally called for a reply from him." (Internal quotation marks omitted.) *State* v. *Harris*, 182 Conn. 220, 228–29, 438 A.2d 38 (1980). In other words, under such circumstances, and if "no other explanation is equally consistent with [the defendant's]

silence," the defendant's silence may be "construed as an admission of guilt . . . ." Id., 229.

We conclude that the trial court properly considered the previously enumerated factors when determining that it was reasonable to conclude that the defendant had adopted as his own Britton's statements inculpating the defendant in the victim's murder. First, Britton, Carr and the defendant were sitting very close together in the back of their work van when Britton made his alleged statement to Carr, thus providing the defendant with ample opportunity to hear what Britton was saying about his involvement in the crime. Additionally, as previously discussed, we disagree with the defendant's contention that Britton's statement was too imprecise to conclude that the defendant had been inculpated in the incident, and that his silence cannot be viewed as a proxy for agreement. As aptly noted by the Appellate Court, "Carr's statement reflects that Britton and the defendant each contributed to the story surrounding the victim's homicide. . . . When Britton spoke alone, the nature of his statement naturally called for a denial from the defendant." (Citation omitted.) *State* v. *Pierre*, supra, 83 Conn. App. 38. Moreover, the brutality of the incident reported by Britton led the trial court to conclude that the defendant had an obligation to deny any participation in the crime if he had in fact not been involved. Under the facts of this case, there was no other explanation suggested equally consistent with the defendant's silence, in the face of Britton's statements attributing to him such brutal and horrific behavior, than that the defendant, by remaining silent, assented to those statements, effectively adopting them as his own.

In sum, after reviewing Carr's written statement in its entirety, we agree with the Appellate Court's determination that the trial court did not abuse its discretion by admitting Carr's prior inconsistent statement into evidence. Britton's statements contained within Carr's

written statement to police were squarely against Britton's penal interest and were sufficiently trustworthy to be admitted as an exception to the rule against hearsay. Additionally, by not objecting to Britton's statements against penal interest, the defendant is deemed to have adopted them as his own, including, most relevantly, those portions that also inculpated the defendant in the victim's murder.

C

### Defendant's Right to Confront the Witnesses Against Him

The defendant further contends that Carr's written statement to police was inadmissible because it infringed upon his constitutional right to confront the witnesses against him.[12] In particular, this contention relates to the defendant's constitutional right to confront both Britton and Carr regarding the statements that Britton made to Carr and the defendant. As an initial matter, we note that with respect to the question of whether an out-of-court statement possesses sufficient indicia of credibility in order to satisfy the requirements of the confrontation clause, our review is plenary. See *State* v. *Rivera*, supra, 268 Conn. 367.

---

[12] The defendant notes in passing in his brief that the admission of Carr's statement into evidence abridged both his state and federal rights to confrontation. To the extent that he is attempting to allege a violation of article first, § 8, of the Connecticut constitution, we decline to reach the defendant's claim because it does not meet the standard we enunciated in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004). Consequently, we analyze the defendant's right to confrontation arguments under the requirements of the United States constitution.

"Beyond [the previously mentioned] evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. In defining the specific limits of the confrontation clause, the United States Supreme Court consistently has held that the confrontation clause does not erect a per se bar to the admission of hearsay statements against criminal defendants. . . . [W]hile a literal interpretation of the [c]onfrontation [c]lause could bar the use of any out-of-court statements when the declarant is unavailable, [the] [c]ourt has rejected that view as unintended and too extreme . . . . At the same time, [a]lthough . . . hearsay rules and the [c]onfrontation [c]lause are generally designed to protect similar values, [the court has] also been careful not to equate the [c]onfrontation [c]lause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The [c]onfrontation [c]lause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." (Citations omitted; internal quotation marks omitted.) Id., 361–62.

"Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore adequate indicia of reliability. *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). . . . [In *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], however, the United States Supreme Court overruled *Roberts* to the extent that it applied to testimonial hearsay statements. . . . In *Crawford*, the court concluded that the reliability standard set forth in the second prong of the *Roberts* test is too amorphous to prevent adequately the improper admission of core testimonial statements that the [c]onfrontation [c]lause plainly meant to exclude. . . . The court held, therefore, that such testi-

monial hearsay statements may be admitted as evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant has had a prior opportunity to cross-examine the declarant." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 362–63.

"In so concluding, the court drew a distinction between testimonial hearsay statements and those deemed nontestimonial. Where *nontestimonial* hearsay is at issue, it is wholly consistent with the [f]ramers' design to afford the [s]tates flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from [c]onfrontation [c]lause scrutiny altogether. . . . In other words, nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if it satisfies both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant.

"Although the court declined to define the terms testimonial and nontestimonial, it considered three formulations of th[e] core class of testimonial statements . . . . The first formulation consists of ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . . The second formulation consists of extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . . Finally, the third formulation consists of statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . The court did not adopt any one particular formulation, noting that, [t]hese formulations

all share a common nucleus and then define the [c]lause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, ex parte testimony at a preliminary hearing. . . . Similarly, [s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. . . . Therefore, [w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the [c]onfrontation [c]lause was directed." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 363–64.

The previously mentioned framework demonstrates that the defendant's claim that the admission of Carr's written statement to police abridged his right to confront the witnesses against him actually implicates two types of hearsay statements requiring separate analyses to determine whether Carr's statement meets the requirements of the confrontation clause. Specifically, it is undisputed that Carr's written statement, which was the product of a police interrogation, is testimonial in nature and therefore implicates the standards discussed in *Crawford* v. *Washington,* supra, 541 U.S. 68. By contrast, Britton's statement to Carr inculpating himself and the defendant was not made under circumstances that would "lead an objective witness reasonably to believe that the statement would be available for use at a later trial"; id., 365; nor does the defendant contend that Britton's statements to Carr were testimonial in nature. In particular, Britton made his statements on his own initiative, to a friend whom he had known for several years, nearly six months before either he or the defendant were arrested for the crime. In light of these circumstances, we conclude that Brit-

ton's statement was nontestimonial in nature, thus implicating the two part test set forth in *Ohio* v. *Roberts*, supra, 448 U.S. 66. See *State* v. *Rivera*, supra, 268 Conn. 365 ("[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not" [internal quotation marks omitted]). We set forth each of these analyses separately.

1

Defendant's Constitutional Right to Confront Carr

As a "testimonial" hearsay statement, Carr's written statement to the police falls under the general rubric of *Crawford* v. *Washington*, supra, 541 U.S. 68, which held that "[w]here testimonial evidence is at issue . . . the [s]ixth [a]mendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Therefore, based on *Crawford*, in order for Carr's written statement to police to be admissible, Carr must have been unavailable at the time of trial, and the defendant must have had a prior opportunity to cross-examine Carr regarding the details of his statement. *Crawford* makes clear, however, that, "when the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements. . . . It is therefore irrelevant that the reliability of some out-of-court statements cannot be replicated, even if the declarant testifies to the same matters in court. . . . The [c]lause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (Citations omitted; internal quotation marks omitted.) Id., 59–60 n.9. This clarification is significant because if Carr is deemed to have been available for cross-examination at trial, his statement does not implicate the defendant's rights under the confrontation clause. Conversely, if Carr is deemed to have been

unavailable for cross-examination at the time of trial, the statement would be inadmissible under *Crawford* because it is undisputed that the defendant was not afforded a prior opportunity for cross-examination.

The defendant contends that, despite the fact that Carr took the stand and answered questions, he was "functionally unavailable" for cross-examination as to the contents of his statement. Specifically, the defendant claims that in light of the fact that at trial Carr claimed that he could not remember ever having heard any of the information recounted in the written statement, that he never had substantively reviewed the statement, and had signed the document only to stop the police from harassing him, the defendant was denied the opportunity to cross-examine Carr, in violation of the requirements of the confrontation clause. The defendant's argument equates a declarant's inability or unwillingness to remember prior statements made to the police with a general unavailability from cross-examination in its entirety. The state contends that Carr took the stand and was available for cross-examination by defense counsel, and thus *Crawford* does not place a restriction on his testimony. We agree with the state.

In deciding *Crawford*, the United States Supreme Court did not define what it means for a witness to be "unavailable" under *Crawford*, nor have we previously considered this question.[13] Connecticut courts, how-

---

[13] As the defendant notes, however, we have determined what it means for a witness to be unavailable within the context of the admissibility of a statement against penal interest. Specifically, in *State* v. *Schiappa*, supra, 248 Conn. 145, we concluded that in light of the witness' asserted inability to remember many of the material facts relating to the events leading up to the victim's death, his memory loss rendered him "unavailable" for the purpose of the hearsay exception. In making this determination, we were concerned with the applicability of rule 804 (a) of the Federal Rules of Evidence, which corresponds with our common-law definition of unavailability with respect to the hearsay exception for statements against penal interest. In particular, rule 804 (a) (3) provides that unavailability of a witness can include situations in which the declarant "testifies to a lack of memory of the subject matter of the declarant's statement . . . ." We went on to

ever, have interpreted the prong of *State* v. *Whelan*,
supra, 200 Conn. 753, requiring that the declarant testify
at trial and be subject to cross-examination in order to
introduce a prior inconsistent statement for substantive
use. We believe that these cases are instructive as to
whether Carr should be deemed "functionally unavail-
able" for purposes of *Crawford*. Specifically, in *State*
v. *Robinson*, 56 Conn. App. 794, 799, 746 A.2d 210,
cert. denied, 253 Conn. 904, 753 A.2d 938 (2000), the
Appellate Court concluded that, despite the witness'
failure to remember any of the statements made in
a prior inconsistent statement, the witness "was not
sufficiently subject to cross-examination to meet *Whel-
an*'s requirements." The court also noted, "[t]he United
States Supreme Court's discussion of the phrase subject
to cross-examination in rule 801 (d) (1) of the Federal
Rules of Evidence proves instructive. . . . Ordinarily
a witness is regarded as subject to cross-examination
when he is placed on the stand, under oath, and
responds willingly to questions. Just as with the consti-
tutional prohibition, limitations on the scope of exami-
nation by the trial court or assertions of privilege by
the witness may undermine the process to such a degree
that meaningful cross-examination within the intent of

note in *Schiappa*, however, that "even though [the witness] was unavailable
for purposes of rule 804 (a) (3) because of his asserted memory loss, he
testified at trial and, consequently, was subject to cross-examination.
Although the defendant's ability to question [the witness] regarding his
statement . . . was limited due to [the witness'] claimed inability to recall
the substance of his statement, the defendant nevertheless had the opportu-
nity to examine [the witness] about the crime and the reasons for his asserted
memory loss, thereby further reducing any confrontation clause concerns."
*State* v. *Schiappa*, supra, 160 n.34. Therefore, although the meaning of
"available for cross-examination" was not at issue in *Schiappa*, we specifi-
cally noted that our holding with respect to how the witness' memory loss
pertained to the admissibility of a statement against penal interest did not
render the witness unavailable for purposes of cross-examination. See id.
In light of this conclusion, we find to be misplaced the defendant's reliance
on *Schiappa* as precedent for the proposition that a witness' memory loss
is necessarily equated with unavailability under the confrontation clause.

the [r]ule no longer exists. But that effect is not produced by the witness' assertion of memory loss—which . . . is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement." (Citation omitted; internal quotation marks omitted.) Id., quoting *United States* v. *Owens*, 484 U.S. 554, 561–62, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988); see also *State* v. *Goodson*, 84 Conn. App. 786, 797, 856 A.2d 1012 ("On cross-examination, the defendant had the opportunity to demonstrate [the witness'] bias, interest and motive, which were for the jury to assess. Furthermore, the jury had the opportunity to observe and to assess [the witness'] demeanor. Given [the witness'] claimed loss of memory, defense counsel was not without resources in his cross-examination because the jury might have been persuaded that [the witness'] prior testimony was as unreliable as his memory arguably was. The defendant, therefore, was hardly reduced to cross-examining a written statement."), cert. denied, 271 Conn. 941, 861 A.2d 514 (2004).

When evaluating the requirements of the confrontation clause in other cases, we also have noted that "[t]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Citations omitted; internal quota-

tion marks omitted.) *State* v. *Andrews*, 248 Conn. 1, 11, 726 A.2d 104 (1999). Additionally, "[a]lthough it is within the trial court's discretion to determine the extent of cross-examination . . . the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment." *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). "The right of confrontation is preserved [however] if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) Id.

Additionally, we note that other jurisdictions that have had the opportunity to interpret what it means to "[appear] for cross-examination" under *Crawford* v. *Washington*, supra, 541 U.S. 59–60 n.9 have concluded that a refusal or inability by the witness to recall the events recorded in a prior statement does not render the witness unavailable for purposes of cross-examination. For example, in *People* v. *Sharp*, 355 Ill. App. 3d 786, 792–93, 825 N.E.2d 706 (2005), the Illinois Appellate Court noted that "[t]he Supreme Court in *Crawford* did not explain what it means for a declarant to appear for cross-examination. However, the [c]ourt's decision in *Crawford* neither overruled nor called into question its two earlier decisions that addressed and resolved this issue: *Delaware* v. *Fensterer*, 474 U.S. 15, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985), and *United States* v. *Owens*, [supra, 484 U.S. 554]." (Internal quotation marks omitted.) Specifically, consistent with Connecticut case law, the court in *Sharp* noted that the United States Supreme Court has held that "[t]he [c]onfrontation [c]lause guarantees an opportunity for effective cross-examination,

not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Internal quotation marks omitted.) *People* v. *Sharp*, supra, 793, quoting *Delaware* v. *Fensterer*, supra, 20. Similarly, the court in *Sharp* noted that the Supreme Court also stated that "[w]e do not think such an inquiry [into the reliability of the testimony] is called for when a hearsay declarant is present at trial and subject to unrestricted cross-examination. In that situation, as the [c]ourt has recognized in [*California* v. *Green*, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)], the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements. . . . We do not think that a constitutional line drawn by the [c]onfrontation [c]lause falls between a forgetful witness' live testimony that he once believed this defendant to be the perpetrator of the crime, and the introduction of the witness' earlier statement to that effect. . . . It seems to us that the more natural reading of subject to cross-examination concerning the statement includes what was available here. Ordinarily a witness is regarded as subject to cross-examination when he is placed on the stand, under oath, and responds willingly to questions." (Citations omitted; internal quotation marks omitted.) *People* v. *Sharp*, supra, 794, quoting *United States* v. *Owens*, supra, 560–61.

In light of this precedent, and the fact that the witness was present at trial and answered all of the questions posed to her on cross-examination, the court in *Sharp* concluded that the witness was available for cross-examination at trial under *Crawford*, and that the confrontation clause did not bar the admission of the hearsay statements at issue. See *People* v. *Sharp*, supra, 355 Ill. App. 3d 795–96. Several other courts have reached similar conclusions. See, e.g., *People* v. *Candelaria*, 107 P.3d 1080, 1087 (Colo. App. 2004) (holding that inability

to recall prior statements at trial did not change fact that defendant had opportunity to cross-examine witness about her statement in accordance with requirements of *Crawford*); *People* v. *Bueno*, 358 Ill. App. 3d 143, 155–56, 829 N.E.2d 402 (2005) (concluding that witness answered all questions asked of him by defense counsel and that, therefore, despite claimed loss of memory, witness had appeared for cross-examination under *Crawford*); *State* v. *Gorman*, 854 A.2d 1164, 1177–78 (Me. 2004) (holding that despite inability to remember prior statements and events and fact that she may have been impaired by psychiatric medications, witness who was subject to cross-examination at trial was not constitutionally unavailable for purposes of confrontation clause analysis under *Crawford*); *State* v. *Yanez*, 2005 Minn. App. LEXIS 412 (concluding that despite witness' inability to remember what was contained in her prior inconsistent statement to police, she was available for cross-examination under *Crawford* and defendant was not denied his right to confrontation); *State* v. *Tate*, 682 N.W.2d 169, 176 n.1 (Minn. App. 2004) (holding that *Crawford* is not implicated where declarant of hearsay statement was present at trial and subject to cross-examination); and *State* v. *Carothers*, 692 N.W.2d 544, 549 (S.D. 2005) (concluding that testimonial statements need not be subject to cross-examination at time they were made if witness is available and subject to cross-examination at trial).

In the present case, Carr took the stand at trial, agreed to testify truthfully, was subject to cross-examination by the defendant, and answered all questions posed by defense counsel. In particular, Carr acknowledged meeting with the detectives in his attorney's office and signing the written statement prepared by the investigating officers. Additionally, Carr responded to several questions regarding his motives and interest in providing information to the police. Carr acknowledged that

as of the time he met with police on February 16, 1999, he had charges pending against him in an unrelated matter, and that those charges later were resolved by his plea to a probation violation and a failure to appear. Furthermore, Carr stated that he had signed the written statement despite the fact that it was not accurate, because the police had contacted him on several occasions and he was interested in trying to get them to stop bothering him. Moreover, Carr confirmed several other pieces of information contained in the statement, including that he had seen news reports about the victim's death, that he had worked with the defendant and Britton at Quality Cleaners around the time of the incident, and that he drank several beers with the defendant and Britton on the way back from the job site. Carr claimed to have no memory, however, of hearing Britton describe how he and the defendant murdered the victim in the manner memorialized in his signed statement to police.

Despite the fact that Carr claimed that he could not remember ever having heard a description of the victim's murder, we conclude that he was available for cross-examination at trial, thus removing any issue under the confrontation clause. First, as previously noted we have held on prior occasions that "an important function of cross-examination is the exposure of a witness' motivation in testifying" and have emphasized the importance of "elicit[ing] facts tending to show motive, interest, bias and prejudice . . . ." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 248 Conn. 11. We agree with the Appellate Court's conclusion that based on the questions Carr answered, "[d]efense counsel was presented with, and used, plenty of ammunition to attack Carr's credibility and truthfulness on cross-examination." *State* v. *Pierre*, supra, 83 Conn. App. 41. In particular, defense counsel's questions demonstrated that Carr's own legal problems may

have given him an incentive to provide police with information in exchange for the ability to negotiate a more favorable sentence. Conversely, defense counsel also elicited testimony to suggest that Carr may have signed the written statement merely to avoid further questioning from McGlynn. Regardless of whether the jury ultimately believed either possibility, Carr's statements provided the defendant with the opportunity to show Carr's bias, interest, potential motives and demeanor as a witness.

Furthermore, we agree with those jurisdictions that have interpreted "availability for cross-examination" under *Crawford* as needing to be synthesized with the United States Supreme Court's holdings in *United States* v. *Owens*, supra, 484 U.S. 561–62, and *Delaware* v. *Fensterer*, supra, 474 U.S. 20. Specifically, although "availability" was not defined in *Crawford*, *Owens* and *Fensterer* make clear that the right to cross-examination does not imply a right to cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. This theme also runs through the existing cases in Connecticut wherein a witness has been deemed subject to cross-examination at trial for *Whelan* purposes despite a claimed inability to remember the details surrounding his or her prior statement. In sum, we conclude that a witness' claimed inability to remember earlier statements or the events surrounding those statements does not implicate the requirements of the confrontation clause under *Crawford*, so long as the witness appears at trial, takes an oath to testify truthfully, and answers the questions put to him or her during cross-examination.

### 2

### Defendant's Constitutional Right to Confront Britton

The defendant also challenges the admission of Britton's statement, contained within Carr's *Whelan* state-

ment, as violative of his sixth amendment right to confrontation. As previously noted, nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if they satisfy both prongs of the test in *Ohio* v. *Roberts*, supra, 448 U.S. 66, namely: (1) if the declarant was unavailable to testify; and (2) the statement bore adequate indicia of reliability. See *State* v. *Rivera*, supra, 268 Conn. 362. In the present case, it is undisputed that Britton was unavailable at trial because he invoked his fifth amendment right against self-incrimination. Therefore, the only question that remains is whether Britton's statements to Carr bore sufficient indicia of reliability to satisfy the second prong of *Roberts*.

"Under the second prong of *Roberts*, a statement is presumptively reliable if it falls within a 'firmly rooted' hearsay exception. . . . The United States Supreme Court recently has addressed the constitutional framework in which hearsay statements against penal interest may be admitted into evidence under the second prong of *Roberts*. In *Lilly* v. *Virginia*, 527 U.S. 116, 127, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), the court recognized that, 'due to the sweeping scope of the label, the simple categorization of a statement as a declaration against penal interest . . . defines too large a class for meaningful [c]onfrontation [c]lause analysis.' . . . Hence, the court divided statements against penal interest, offered into evidence in criminal trials, into three principal categories: '(1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant.' " (Citation omitted.) *State* v. *Rivera*, supra, 268 Conn. 365–66. As in the present case, the third category of statements against penal interest was at issue in *Lilly*.

"In *Lilly*, a plurality of the court determined that this third category of hearsay encompasses statements that are inherently unreliable. . . . Specifically, th[e] truth-finding function of the [c]onfrontation [c]lause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. . . . Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence. . . . Accordingly, the plurality concluded that accomplices confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule . . . .

"A majority of the court reaffirmed, however, that statements against penal interest nonetheless may be admitted, consistent with the confrontation clause, under the second prong of *Ohio* v. *Roberts*, supra, 448 U.S. 66, provided that they possess particularized guarantees of trustworthiness . . . . The plurality further concluded: [W]hen deciding whether the admission of a declarant's out-of-court statements violates the [c]onfrontation [c]lause, [appellate] courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the [c]lause." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 366–67. Accordingly, our review of whether Britton's statement was sufficiently trustworthy under the confrontation clause is plenary.

When assessing the reliability and trustworthiness of Britton's statement for purposes of compliance with the confrontation clause, we are mindful of the fact that the analysis is similar, but not identical, to that carried out with respect to whether the statement was properly admitted under the statement against penal interest exception to the rule against hearsay. See part

I B 1 of this opinion. Specifically, with respect to the requirements of the confrontation clause, "[w]e note that independent corroborative evidence may not be used to support a statement's particularized guarantees of trustworthiness, because reliance on such evidence gives rise to an undue risk that presumptively unreliable hearsay evidence will be admitted not on the basis of its inherent reliability but, rather, by bootstrapping on the trustworthiness of other evidence at trial . . . . In other words, evidence not directly related to the circumstances surrounding the making of the statement cannot be used to substantiate the statement's trustworthiness." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera,* supra, 268 Conn. 367 n.15. Therefore, in order for Britton's statement to withstand scrutiny under the confrontation clause, the statement and the circumstances under which it was made must have been sufficiently trustworthy on their own, without the assistance of corroborating evidence, in order for the statement to be deemed reliable. In light of the first three reasons already enumerated in part I B 1 of this opinion, our independent review of the circumstances under which Britton made the statement to Carr persuades us that the statement bears "particularized guarantees of trustworthiness," thereby satisfying the reliability requirements of the confrontation clause as described by the United States Supreme Court in *Ohio* v. *Roberts,* supra, 448 U.S. 66. In sum, Britton's statement was squarely against his penal interest, it was made to a friend on Britton's own initiative outside the coercive influence of a police interrogation, and it was made during a period that was very close in time to the victim's murder.

## II

## DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL

The defendant next claims that the Appellate Court improperly concluded that his sixth amendment right

to counsel failed to attach upon the signing of an information by the state on May 13, 1999.[14] The state contends that it was not until the entire arrest warrant, with the attached signed information, was filed with the court at arraignment that the document became an information within sixth amendment jurisprudence, thus triggering the defendant's constitutional right to counsel. We agree with the state.

The following additional facts and procedural history are relevant to our resolution of this claim. The office of the state's attorney first became involved in the investigation of the victim's death when the victim's skeletal remains were located in Bates Woods on January 10, 1999. During the course of their investigation, between February 10, 1999, and March 8, 1999, the police obtained three written statements from the defendant. In each of these statements, the defendant minimized his role in the crime. On May 13, 1999, the Connecticut state police submitted an arrest warrant application with an attached information for the defendant, which was reviewed and signed by both an assistant state's attorney and a judge of the Superior Court. On June 14, 1999, law enforcement authorities from the Connecticut state police, New London police department, and the Garden City police department arrested the defendant in Garden City, New York, as a fugitive from the underlying Connecticut warrant.

Upon being arrested in New York, the defendant met with McGlynn and Buglione, and provided an eleven

---

[14] The defendant also argues that, assuming his right to counsel attached upon the state signing the information on May 13, 1999, his waiver of his fifth amendment rights did not act as a valid waiver of his sixth amendment right to counsel under the federal constitution or his right to counsel under article first, § 8, of the constitution of Connecticut. Because we conclude that the defendant's right to counsel did not attach on May 13, 1999, but rather at arraignment when the entire arrest warrant with the attached signed information was filed in court, we need not address these additional claims.

page statement and three diagrams related to the victim's murder. This statement included reference to the fact that the defendant was with the victim when he was beaten in the parking lot of the defendant's apartment and taken to Bates Woods, as well as the fact that Britton had taken a metal pipe from the victim's car and had hit the victim about the face until he died. Additionally, the defendant provided oral statements to McGlynn and Buglione on June 24, 1999, while they were transporting the defendant back to Connecticut for arraignment. Specifically, after entering Connecticut from New York, the defendant was once again advised of his *Miranda* rights, at which point he noted that his girlfriend in New York was pregnant and he became emotional about the prospect of not being able to see his child. The defendant also inquired about what was going to happen to him upon returning to Connecticut, and he stated that he was upset that Smith had not been arrested. McGlynn and Buglione suggested that it may be a good time for the defendant "to speak to the state's attorney and look for some type of deal." They also inquired as to whether the defendant would "take [fifty] years—[fifty-five] years," to which the defendant replied, "[w]ell, it's better than life, he would take it . . . ." The defendant subsequently was arraigned in Connecticut the following day, June 25, 1999, at which point the arrest warrant with the attached signed information also was filed with the court.

Prior to trial, the defendant moved to suppress his June 14, 1999 written statement as violating his sixth amendment right to counsel. The trial court denied the motion to suppress, holding that an arrest following the issuance of a warrant does not mark the commencement of formal legal proceedings against the defendant. Subsequent to this ruling, the defendant filed a supplemental motion to suppress, seeking the suppression of the oral statement the defendant made to McGlynn and

Buglione on June 24, 1999. Following an evidentiary hearing, the trial court again denied the motion, referencing its earlier decision, and concluding once again that an arrest pursuant to a warrant does not signal the formal commencement of legal proceedings entitling a defendant to the protections of the sixth amendment.

As an initial matter, we note that "[o]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Mann*, 271 Conn. 300, 322–23, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005), quoting *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004). The defendant challenges the trial court's legal conclusion that the critical stage triggering the protections of the sixth amendment did not occur until the information was filed and the defendant was charged at his arraignment.

"The [s]ixth [a]mendment guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the [a]ssistance of [c]ounsel for his defence.' " *United States* v. *Gouveia*, 467 U.S. 180, 187, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984). This right attaches only "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby* v. *Illinois*, 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); *State* v. *Falcon*, 196 Conn. 557, 560, 494 A.2d 1190 (1985). "The initiation of judicial criminal proceedings is far from a

mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of [the] government and [the] defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the criminal prosecutions to which alone the explicit guarantees of the [s]ixth [a]mendment are applicable." (Internal quotation marks omitted.) *Kirby* v. *Illinois*, supra, 689–90. We also have noted that the time of the attachment of the right to counsel under the federal constitution is no different under article first, § 8, of the constitution of Connecticut. See *State* v. *Palmer*, 206 Conn. 40, 64, 536 A.2d 936 (1988).

"The United States Supreme Court has indicated that the sixth amendment's core purpose is to assure that in any criminal prosecutio[n] . . . the accused shall not be left to his own devices in facing the prosecutorial forces of organized society. . . . By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the intricacies . . . of law . . . is needed to assure that the prosecution's case encounters the crucible of meaningful adversarial testing." (Citations omitted; internal quotation marks omitted.) *State* v. *Cichowski*, 203 Conn. 97, 101–102, 523 A.2d 503 (1987). In this regard, "[w]e have consistently adopted the reasoning of the United States Supreme Court with respect to when the sixth amendment right to counsel attaches in a criminal proceeding, finding that [n]o right to counsel attaches until prosecution has commenced."[15] (Internal quotation marks omit-

[15] To the extent that we have offered inconsistent guidance in this area, it has not been in favor of a finding that the sixth amendment right to counsel attaches upon the signing of an information by the state, as is now

ted.) Id., 102; *State* v. *Ferrell*, 191 Conn. 37, 44 n.10, 463 A.2d 573 (1983); *State* v. *Ledbetter*, 185 Conn. 607, 609, 441 A.2d 595 (1981).

For example, in *State* v. *Falcon*, supra, 196 Conn. 563–64, we concluded that an extradition hearing does not represent the same type of critical confrontation between an accused and a prosecutor such as found in an arraignment where counsel is constitutionally required. Specifically, we noted: "At an arraignment, a defendant is advised of the charges against him and enters a plea. . . . By contrast, at an extradition hearing, a defendant is not asked to plead or to make any other decisions that could affect his right to a fair trial. . . . [M]ost courts in other jurisdictions have held that even proceedings contesting extradition are not a critical stage in the prosecution requiring the presence of counsel." (Citations omitted; internal quotation marks omitted.) Id., 564. Similarly, in *State* v. *Vitale*, 190 Conn. 219, 232, 460 A.2d 961 (1983), we concluded that an interrogation following an arrest, but prior to arraignment or indictment, regardless of whether accompanied by a warrant, does not call into play the sixth amendment right to counsel. In particular, in *Vitale* we noted that "[the defendant] seeks to analogize his situation . . . to that of a defendant who has been formally charged with a crime by indictment or information. From such a defendant the government may not elicit self-incriminating evidence in the absence of counsel." Id., 231, citing *Massiah* v. *United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). "The rights

advocated for by the defendant. Rather, without actually deciding the issue of when the right to counsel attaches, we have previously stated that it is still incumbent upon the defendant to exercise his sixth amendment rights once they attach. See *State* v. *Lewis*, 220 Conn. 602, 612–13, 600 A.2d 1330 (1991) ("[e]ven if the defendant is correct and his right to counsel had attached [when an information was filed in court], his ensuing statements would not be rendered inadmissible under the sixth and fourteenth amendments unless he had invoked that right").

of a defendant against self-incrimination prior to the formal commencement of a judicial criminal proceeding against him are, of course, protected by the *Miranda* warning requirements. We see no necessity for superimposing the more complete *Massiah* restrictions during the period between the arrest and the filing of an information or indictment." *State* v. *Vitale,* supra, 233.

We recognize that, prior to the present case, we have not specifically addressed the question of whether the signing of an information in conjunction with obtaining an arrest warrant constitutes the commencement of adversarial judicial proceedings within the meaning of the sixth amendment. The defendant argues that once the state's attorney signed an information in conjunction with obtaining a warrant for his arrest, the state had committed itself to prosecute. We are not persuaded. To the contrary, we conclude that it is not simply the signing of the information document that triggers the protections of the sixth amendment. Rather, it is the state's decision to move forward with the prosecution of the crimes charged in the information document, by arraigning the suspect and filing the information with the court, that signifies the state's commitment to prosecute as well as the initiation of the adversary judicial proceedings that trigger a defendant's right to counsel under the sixth amendment. See *State* v. *Falcon,* supra, 196 Conn. 562 ("[n]either the request of a state's attorney, nor the action of a court in granting that request, converts an arrest warrant into an official accusation signaling the state's commitment to prosecute"). Additionally, as we noted in *Falcon,* if an arrest and extradition hearing have not been viewed as a commitment to prosecute or the initiation of an adversarial judicial proceeding triggering rights under the sixth amendment, the signing of an information attached to an arrest warrant application hardly can be considered definitively prosecutorial and adversarial in nature. Indeed,

the arrest warrant and information are prepared largely without the defendant's knowledge and it is not until the defendant is formally charged in open court at arraignment that he enters a plea, is faced with an adversarial judicial process, and the prosecution begins.

Furthermore, we agree with the state that a review of the procedure for and contents of an arrest warrant and information, as set out in Practice Book §§ 36 and 37, is instructive. "The warrant shall be signed by the judicial authority and shall contain the name of the accused person, or if such name is unknown, any name or description by which the accused can be identified with reasonable certainty, and the conditions of release fixed, if any. It shall state the offense charged and direct any officer authorized to execute it to arrest the accused person and to bring him or her before a judicial authority without undue delay." Practice Book § 36-3. The offenses charged are written on court form JD-CR-71, entitled "Information," and the "Title, Allegation and Counts" section of the form is filled out and signed by a state's attorney. A copy of the arrest warrant with the attached and signed information are then given to the accused upon being taken into custody. See Practice Book § 36-5. Subsequently, once the information is filed and the defendant is brought before the court at arraignment, he is advised of his constitutional rights, including his right to the services of an attorney. See Practice Book § 37-3. The rules of practice also contain provisions for canceling or amending arrest warrants and informations as necessary. Specifically, Practice Book § 36-6 provides: "At the request of the prosecuting authority, any unserved arrest warrant shall be returned to a judicial authority for cancellation. A judicial authority also may direct that any unserved arrest warrant be returned for cancellation." Similarly, Practice Book §§ 36-16, 36-17 and 36-18 allow for the amendment of the information for substantive and nonsubstantive reasons

prior to trial for any reason, and after trial, but prior to verdict, upon a showing of good cause.

These provisions of the rules of practice all indicate that the signing of an information does not necessarily represent a commitment by the state to prosecute the defendant. Instead, it may be more accurately considered a prelude to a criminal prosecution, subject to amendment or cancellation as necessary, rather than the initiation of an adversarial judicial proceeding in its own right. In short, as suggested by Practice Book § 37-3, we conclude that the defendant's constitutional right to counsel did not attach upon the signing of the information, but when the information was acted upon by the state and filed at the defendant's arraignment. It is at this point in the process that the "prosecutorial forces of organized society" aligned against the defendant, and the defendant actually found himself "immersed in the intricacies of substantive and procedural criminal law," thus warranting protection under the sixth amendment. *Kirby* v. *Illinois*, supra, 406 U.S. 689.

Finally, the defendant points to a recent case in the United States District Court for the District of Connecticut as persuasive authority for the proposition that the sixth amendment right to counsel attaches upon the state's signing of the information. See *United States* v. *Mills*, United States District Court, Docket No. 3.03-CR-0032, slip op. 11 (D. Conn. October 1, 2003). Specifically, in *Mills*, "one day prior to the detectives' interview with the defendant, an [a]ssistant [s]tate's [a]ttorney for the [s]tate of Connecticut completed an [i]nformation in Connecticut Superior Court. The [i]nformation charged the defendant with three counts of [c]arrying a [p]istol [w]ithout a [p]ermit . . . and two counts of [i]llegal [t]ransfer of a [f]irearm . . . . One day after the detectives' interview with the defendant, June 19, 2002, the defendant was brought to New Haven Superior Court

and arraigned on the [state] felony gun charges contained in the [i]nformation." Id., 4. Subsequently, the defendant filed a motion to suppress his statements made to police, arguing that "since an [i]nformation was issued by an [a]ssistant [s]tate's [a]ttorney" the day before his interview he should have been afforded counsel when he spoke with detectives. Id., 10. The court granted the defendant's motion to suppress and concluded that "the defendant's [s]ixth [a]mendment right to counsel had attached at the time of the interview since an [i]nformation had already been issued . . . ." Id., 11. It also noted: "The fact that the [i]nformation must be signed by the prosecutorial authority indicates that a prosecutorial—rather than investigatory—stance has begun once the [i]nformation is signed. . . . For these reasons, the court finds that once an [i]nformation is filed in Connecticut, the [s]ixth [a]mendment right to counsel attaches, as formal charges, including an information, had been filed."[16] (Internal quotation marks omitted.) Id., 14.

As an initial matter, we agree with the state that the District Court's use of the words "filed," "issued" and "signed" nearly interchangeably in its order makes it difficult to discern at which point in the warrant application procedure it concluded that the critical stage triggering the protections of the sixth amendment actually took place. For all of the foregoing reasons, to the

---

[16] We are mindful of the fact that on appeal, the District Court's order suppressing the defendant's statements was affirmed. See *United States* v. *Mills*, 412 F.3d 325, 327 (2d Cir. 2005). On appeal, however, the government did not challenge the District Court's determination that the police officers had violated the defendant's right to counsel as to the state charges. Rather, the issue on appeal was whether statements taken by the police, in violation of a defendant's right to counsel as to previously charged state offenses, but prior to the filing of federal charges for the same crime, could be admitted in a separate federal prosecution. Id., 328. Thus, we do not read the affirmance by the United States Court of Appeals as holding that the signing of a Connecticut arrest warrant, without more, triggers the defendant's sixth amendment right to counsel.

extent that it concluded that the sixth amendment right to counsel attaches in Connecticut upon the signing of an information by the state, we disagree. Alternatively, to the extent that its conclusion was limited to the proposition that the right to counsel in Connecticut attaches upon the filing of an information with the court, we note that in the present case the information was not filed at the time of signing on May 13, 1999, but more than one month later when the defendant was arraigned. Consequently, the holding in *Mills* is inapplicable to the present case.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.